**Robert D. PHILLIPS, individually and on behalf of other shareholders of Computer Depot, Inc., similarly situated, Plaintiffs,**

v.

**KIDDER, PEABODY & CO., Defendant.**

No. 87 Civ. 4936 (DLC) (JCF).

United States District Court,
S.D. New York.

July 2, 1996.

Samuel P. Sporn, Joel P. Laitman, Schoengold & Sporn, P.C., New York City, for plaintiffs.

Philip K. Howard, Jack P. Levin, Linda Goldstein, C. William Phillips, Howard, Darby & Levin, New York City, for defendant.

### MEMORANDUM AND ORDER

FRANCIS, United States Magistrate Judge.

The plaintiff in this class action, Robert D. Phillips, alleges that Kidder, Peabody & Co. ("Kidder") violated federal securities laws and committed common law fraud in connection with a public offering of stock in Computer Depot, Inc. ("CDI" or "the company").

The parties consented to my jurisdiction for all purposes pursuant to 28 U.S.C. § 636(c). The plaintiff alleges violations of Sections 11 and 12(a)(2) of the 1933 Securities Act, 15 U.S.C. §§ 77k and 77*l* (a)(2), Section 10(b) of the 1934 Securities Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5. Kidder now moves for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons that follow, the defendant's motion is granted.

### Background [1]

CDI is a now-defunct corporation that operated a chain of retail personal computer outlets. CDI began its operations in March 1981 with one leased computer center located in a Dayton's department store in Minneapolis, Minnesota. CDI marketed its computer products through leased space in major department stores, taking advantage of the department stores' customer traffic, advertising, and consumer credit arrangements. The stores benefitted from CDI's computer expertise, its relationship with suppliers, and its ability to secure volume discounts. By 1984, CDI was operating forty-one computer centers in fifteen states and the District of Columbia.

CDI made a public stock offering in 1984 in order to finance future expansion. Kidder, a lead underwriter for this public offering, issued a Prospectus in connection with the offering on July 12, 1984. When the value of the stock subsequently plummeted, litigation ensued. On June 25, 1986, Ronald Kassover, another CDI shareholder filed an action in the federal district court for the District of Minnesota. His motion for class certification, however, was denied on April 27, 1987, as was a motion by Mr. Phillips to intervene in the Minnesota action. *Kassover v. Computer Depot, Inc.*, 691 F.Supp. 1205, 1214 (D.Minn.1987), *aff'd,* 902 F.2d 1571 (8th Cir.1990) (table).

Mr. Phillips then initiated the instant action. The plaintiff states in his complaint that he relied on this Prospectus when he decided to purchase three hundred shares of

---

1. As several opinions have been previously issued in this case, familiarity with facts is assumed. This opinion briefly recounts the essential facts.

CDI stock on the date of the initial public offering, and an additional one hundred shares on June 10, 1985. The plaintiff alleges that the Prospectus presented a "falsely optimistic picture of CDI's future growth, expansion, business products, and profitability." Complaint, ¶ 17.

In his amended class action complaint, the plaintiff alleges that the Prospectus contained the following false or misleading representations: (1) "[CDI] believes that a new computer center can generally achieve profitability ... within a relatively short period after it opens;" (2) "[CDI] believes that it is able to remain price competitive due to its large volume of purchases which permits it to take advantage of high levels of price discounts;" (3) "subject to obtaining financing and to the other conditions relating to opening new stores, [CDI] presently plans to open approximately 90 new computer centers in calendar 1985;" and (4) CDI would approximately break even during the second quarter ended July 28, 1984. Am.Complaint, ¶ 58. Specifically, the plaintiff alleges that the defendant failed to disclose the following material facts: adverse change in the personal computer industry ("industry shake-out") which led to decreases in prices and intensified competition; substantial losses incurred in the thirteen weeks preceding the public offering; and significant inventory shrinkage [2] and inadequacy of CDI's internal inventory controls. Am.Complaint, ¶ 59.

Kidder now moves for summary judgment, arguing that: (1) the claims regarding CDI's inventory shrinkage and all class claims are barred by the statute of limitations; (2) the accuracy of each statement in the Prospectus is established by undisputed facts; (3) contrary to the plaintiff's allegation, the Prospectus did disclose allegedly "omitted" facts with regard to falling computer prices and the competitiveness of the computer industry; and (4) Kidder affirmed the statements in the Prospectus based on extensive due diligence and had a reasonable basis for adopting any forward-looking statements concerning CDI's future.

The defendant brought a prior motion for summary judgment on February 1, 1991. The Honorable Shirley Wohl Kram, United States District Judge, denied the motion without prejudice to renewal on the ground that further discovery was necessary. *Phillips v. Kidder, Peabody & Co.*, 782 F.Supp. 854, 866 (S.D.N.Y.1991).

*Discussion*

A. *Summary Judgment*

■ A motion for summary judgment shall be granted only when it is clear that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party has the initial burden of demonstrating the absence of a genuine issue of material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). The non-moving party has the burden of coming forward with "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). There must be enough evidence in favor of the non-moving party's case such that a jury could return a verdict in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgement; the requirement is that there be no *genuine* issue of *material* fact." *Id.* at 248, 106 S.Ct. at 2510.

[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the non-moving party's case

---

**2.** Inventory shrinkage occurs when a company's actual inventory determined by a physical count is less than the inventory reflected on its books and records. This difference is then "written

off," reducing the company's gross profit margin and ultimately the company's reported earnings and assets.

necessarily renders all other facts immaterial.

Celotex Corp. v. Catrett, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

■ "For purposes of summary judgment [in a securities fraud claim], our inquiry is confined to whether a genuine issue of material fact exists as to: (1) whether the alleged misrepresentations or omissions are material; (2) whether [the] plaintiffs were justified in relying on the misrepresentations and omissions; and (3) whether the misrepresentations or omissions were the actual and proximate cause of [the] plaintiffs' losses." Medline Industries, Inc. Employee Profit Sharing & Retirement Trust v. Blunt, Ellis & Loewi, Inc., No. 89 Civ. 4851, 1993 WL 13436, at *4 (N.D.Ill. Jan. 21, 1993) (footnote omitted). A plaintiff bears the burden of persuasion in alleging facts which suggest that the statements were "made or reaffirmed without a reasonable basis or [were] disclosed other than in good faith." Roots Partnership v. Lands' End, Inc., 965 F.2d 1411, 1418 (7th Cir.1992) (quoting Wielgos v. Commonwealth Edison Co., 892 F.2d 509, 513 (7th Cir.1989)). Where the facts of a case lead to conflicting inferences and conclusions, summary judgment is precluded. In re Chaus Securities Litigation, No. 88 Civ. 8641(SWK), 1990 WL 188921, at *4 (S.D.N.Y. Nov. 20, 1990) (citing Robertson v. Seidman & Seidman, 609 F.2d 583, 591 (2d Cir.1979)).

### B. Statute of Limitations

Prior to addressing the substantive arguments contained in the defendant's motion, I turn to the issue of the statute of limitations. The defendant's argument in this regard is two-fold: it argues that all class claims are time barred, and that the amended claims with respect to the break even forecast are barred even if they relate back to the original complaint.

### 1. Class Claims

■ The plaintiff argues that this Court has already ruled that the statute of limitations was tolled during the pendency of the Kassover litigation with regard to both individual and class claims. In support of this argument the plaintiff cites six decisions by three different judges that purportedly reject, explicitly or implicitly, the defendant's argument that the class claims are barred.[3] Indeed, the defendant has raised this argument previously on several occasions: in its first motion for summary judgment, on reargument of that motion, and in its objection to my report and recommendation. Thus, it would appear anomalous to approach this subject so late in the case. However, upon closer examination of these decisions, it is clear that although several opinions ruled on the timeliness of individual claims, no judge has passed on the viability of the class claims.

There is no dispute that the plaintiff's individual claims were tolled by the Kassover litigation. In my May 30, 1991 Report and Recommendation I found that "the statute of limitations for Mr. Phillips was tolled for the approximately ten months that the Kassover class action motion was pending, and it is therefore 'deemed' to have been filed for limitations purposes on September 7, 1986." Report and Recommendation dated May 30, 1991 at 7 (emphasis supplied; citation omitted). Judge Kram adopted this finding. Phillips, 782 F.Supp. at 859.

During reargument on the defendant's initial summary judgment motion, Judge Preska stated that "[w]e all agree that the action is deemed filed on September 7, 1986 and, therefore the question is whether the plaintiff was on inquiry notice prior to September 7, 1985." Transcript of the Hearing dated January 29, 1993 at 2 (emphasis supplied). Contrary to the plaintiff's position, neither the written opinions nor the transcript of that hearing give any indication that the

---

3. See Report and Recommendation dated May 30, 1991 (recommending that defendant's motion for summary judgment be granted in part and denied in part); Memorandum Opinion and Order dated Dec. 13, 1991 (adopting report in part and denying motion for summary judgment); Oral Ruling on Reargument dated Jan. 29, 1993 (denying summary judgment motion on reargument); Report and Recommendation dated Dec. 3, 1993 (recommending certification); Order of Certification dated Sept. 16, 1994 (adopting report and recommendation); Memorandum and Order dated Oct. 13, 1994 (granting leave to amend).

Court ruled on anything but Mr. Phillips' individual claims.

Indeed, it would have been inappropriate for the Court to address the timeliness of the class claims until the class was certified on September 16, 1994.[4] The plaintiff's argument that the decision to certify the class and accompanying opinions implicitly rejected the defendant's statute of limitations defense is unpersuasive. The Supreme Court has explicitly prohibited inquiry into the merits of the case on a motion for class certification:

> We find nothing in either the language or history of Rule 23 that gives a court any authority to conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action.

*Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 177, 94 S.Ct. 2140, 2143, 40 L.Ed.2d 732 (1974). The Second Circuit adheres to this rule. *See Sirota v. Solitron Devices,* 673 F.2d 566, 570–71 (2d Cir.) (pre-certification inquiry inappropriate because class certification motions are subject to less rigorous procedural standards than motions to dismiss or motions for summary judgment), *cert. denied,* 459 U.S. 838, 103 S.Ct. 86, 74 L.Ed.2d 80, 459 U.S. 908, 103 S.Ct. 213, 74 L.Ed.2d 170 (1982); *Brickman v. Tyco Toys, Inc.,* 731 F.Supp. 101, 107 (S.D.N.Y.1990) (district court may not look to merits of securities fraud claim in determining whether class certification is appropriate).

Finally, the plaintiff argues that the opinion granting him leave to amend the complaint, filed after the class was certified, constituted an implicit finding that the statute of limitations was equitably tolled for both the plaintiff and the class. This argument also fails. While the Court held that the amended allegations were factually related to the prior complaint, it made no finding as to the statute of limitations. Memorandum and Order dated Oct. 13, 1994 at 9–10. The motion to amend could have been denied, of course, if amendment were clearly futile, *see Azurite Corp. Ltd. v. Amster & Co.,* 52 F.3d 15, 19 (2d Cir.1995) (*citing Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962)); *Ketchum v. Cruz,* 961 F.2d 916, 920 (10th Cir.1992), and an amendment is futile if the cause of action sought to be added is barred by the statute of limitations. *Mackensworth v. S.S. American Merchant,* 28 F.3d 246, 251 (2d Cir.1994).

However, motions to amend are subject to a very liberal standard and leave to amend "shall be freely given when justice so requires." Fed.R.Civ.P. 15(a); *Ronzani v. Sanofi S.A.,* 899 F.2d 195, 198 (2d Cir.1990). To overcome the hurdle of futility on a motion to amend, the claim need only be colorable, not invincible. *See Lopez v. John Hancock Mutual Life Insurance Co.,* 115 F.R.D. 316, 317 (S.D.N.Y.1987) (motion to amend granted where plaintiff alleged that doctrine of equitable estoppel barred assertion of statute of limitations defense and thus defamation claim was colorable). The assessment of the case's merits is very limited, and cannot bar subsequent inquiry into affirmative defenses such as the statute of limitations. In *Lopez* the court granted leave to amend without prejudice to raising the statute of limitations argument later and stated:

> In briefing the equitable estoppel issue, the parties have created, in effect, a miniature motion for summary judgment. . . . The Court has not lost sight, however, that the instant motion is one to amend the complaint and that an analysis of the sufficiency of the proposed defamation count must remain subordinate to Rule 15 principles. . . . The Court agrees that plaintiffs

---

**4.** I note that although the defendant raised the untimeliness argument in their first summary judgment papers, in the objections to my report and recommendation, and on reargument of the summary judgment motion, it did not explicitly address this issue in its motion opposing certification. At most, the defendant incorporated this argument by reference to its summary judgment papers:

> Even assuming plaintiff and the class can temporarily avoid the outright dismissal of the

> Complaint on the ground that it is barred by the relevant statutes of limitation (as we argue in the accompanying motion for summary judgment), the pervasive role that the limitations issue will play in this case also precludes a finding that common issues will predominate.

Memorandum of Law in Opposition to Plaintiff's Motion for Class Certification, at 2.

ought to be afforded an opportunity to test [their] claims on the merits.

*Id.* at 317–18 (citations omitted).[5] The amendments sought by the plaintiff in this case stated a colorable claim, and thus it was appropriate to grant leave to amend. However, that ruling did not constitute explicit consideration of the affirmative statute of limitations defense.

■ Having disposed of the plaintiff's "law of the case" contentions, I now turn to the merits of Kidder's statute of limitations arguments. In the seminal decision on the subject, *American Pipe & Construction Co. v. Utah*, 414 U.S. 538, 94 S.Ct. 756, 38 L.Ed.2d 713 (1974), the Supreme Court held that "the commencement of the original class suit tolls the running of the statute for all purported members of the class who make timely motions to intervene after the court has found the suit inappropriate for class action status." *Id.* at 553, 94 S.Ct. at 766. *See also Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345, 346, 103 S.Ct. 2392, 2396, 76 L.Ed.2d 628 (1983) (filing of class action tolls statute of limitations for other members of putative class until class certification denied). The Second Circuit in *Korwek v. Hunt*, 827 F.2d 874 (2d Cir.1987) considered "whether the tolling rule [of *American Pipe* ] applies to permit the filing by putative class members of a subsequent class action nearly identical in scope to the original class action which was denied certification." *Id.* at 876. The Court held that the *American Pipe* tolling doctrine did not apply to subsequently filed class actions following "a definitive determination of the inappropriateness of class certification." *Id.* at 879. Several other circuits have adopted a similar rule. *See Griffin v. Singletary*, 17 F.3d 356, 359 (11th Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 723, 130 L.Ed.2d 628 (1995); *Andrews v. Orr*, 851 F.2d 146, 149 (6th Cir.1988); *Robbin v. Fluor Corp.*, 835 F.2d 213, 214 (9th Cir.1987); *Salazar–Calderon v. Presidio Valley Farmers Association*, 765 F.2d 1334, 1351 (5th Cir. 1985), *cert. denied*, 475 U.S. 1035, 106 S.Ct. 1245, 89 L.Ed.2d 353 (1986), 493 U.S. 821,

110 S.Ct. 79, 107 L.Ed.2d 45 (1989); *Bertrand v. Industrial Development Authority of City of Chandler, Arizona*, No. Civ. 89–1087 (PH RCB), 1990 WL 264525 at *3 (D.Ariz. Sept. 13, 1990); *Burns v. Ersek*, 591 F.Supp. 837, 839–40 (D.Minn.1984).

The *Korwek* rule is based on the principle that the statute of limitations for class claims should not be tolled indefinitely as successive class actions are brought but class certification is denied. *Korwek*, 827 F.2d at 878–79. This appears to undermine the utility of class actions, since it permits an erroneous denial of class certification to effectively foreclose the claims of all class members who do not have a sufficient financial stake to warrant their commencing or intervening in an individual action. Nevertheless, this is clearly the law of the Second Circuit and must be followed here.

■ The plaintiff argues that *Korwek* rule does not apply to this case, because the court in *Kassover* did not make the definitive determination of inappropriateness contemplated by the Second Circuit. Specifically, the plaintiff asserts that the district court denied the class certification because they found Mr. Kassover to be an inappropriate class representative. It is true that some courts refuse to apply the no-tolling rule where prior certification was denied based on inadequacy of class representative. *See, e.g. In re Quarterdeck Office Systems, Inc. Securities Litigation*, No. CV–92–3970–DWW (GHKX), 1994 WL 374452 at *5 (C.D.Cal. March 24, 1994); *Shields v. Smith*, C–90–0349 (FMS), 1992 WL 295179 at *3 (N.D.Cal. Aug. 14, 1992); *Shields v. Washington Bancorporation*, 1992 WL 88004 at *2 (D.D.C.1992); *but see Griffin*, 17 F.3d at 359 (no tolling where class certification denied based on named plaintiff's lack of standing).

However, the court in *Kassover* based its decision on two grounds, only one of which concerned the adequacy of Mr. Kassover as a class representative. *Kassover*, 691 F.Supp. at 1213. The *Kassover* court further found the class action device to be inappropriate:

---

5. Here, contrary to the plaintiff's insinuation, the defendant did not raise the statute of limitations argument on the motion to amend.

The court also concludes that a class action is not a superior method of adjudicating [the] controversy now before it.... The transparently *in terrorem* purpose of plaintiff's class certification effort renders the class action device a distinctly inferior method of adjudicating this controversy. Therefore, the court will deny plaintiff's motion to certify a plaintiff class in this action.

*Id.* at 1214 (citations omitted). This finding falls squarely under the *Korwek* rule. Thus, I find that the pendency of the *Kassover* action did not toll the class claims in this action.

■ The statute of limitations for Section 11 and 12(2) claims is set forth in Section 13 of the Securities Act which provides:

No action shall be maintained to enforce any liability created under section 77k or 77*l* (2) of this title unless brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence, or, if the action is to enforce a liability created under section 77*l* (1) of this title, unless brought within one year after the violation upon which it is based. In no event shall any such action be brought to enforce a liability created under section 77k or 77*l* (2) of this title more than three years after the sale.

15 U.S.C. § 77m.

The same limitations period governs Section 10b claims. *Ceres Partners v. GEL Associates,* 918 F.2d 349, 363–64 (2d Cir. 1990) (abandoning borrowing from state statute of limitations and adopting uniform rule); *see also Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,* 501 U.S. 350, 361, 111 S.Ct. 2773, 2781, 115 L.Ed.2d 321 (1991) (adopting uniform federal statute of limitations for 10(b) claims). Although this action was commenced prior to *Ceres* and *Lampf,* the rule announced in those cases applies retroactively. *Welch v. Cadre Capital,* 946 F.2d 185, 187–88 (2d Cir.1991). Indeed, Judge Kram, in a prior opinion in this case,

explicitly held that "it is clear that the one year/three year limitations period adopted in *Lampf* must be applied to the present case." *Phillips,* 782 F.Supp. at 865 (citations omitted).

Thus, all claims in this action are governed by the same statute of limitations. The complaint in the instant action was filed on July 10, 1987. Therefore, applying the one year statute of limitations, the claims must be dismissed if, by exercising reasonable diligence, the class could have discovered prior to July 10, 1986 the facts that give support to its claims.[6] CDI filed for bankruptcy on December 20, 1985. Thus, the class was on notice of potential claims against the defendant at that time. *See In re Integrated Resources Real Estate Ltd. Partnerships Securities Litigation,* 815 F.Supp. 620, 664 (S.D.N.Y.1993); *Gruber v. Price Waterhouse,* 697 F.Supp. 859, 865 (E.D.Pa.1988), *aff'd,* 911 F.2d 960 (3d Cir.1990). Accordingly, the class claims are barred by the statute of limitations.

### 2. *Break Even Claims*

The second prong of the defendant's statute of limitations argument is that the plaintiff's individual claims relating to CDI's second quarter losses are barred even if they relate back to his original claims. The plaintiff argues that his "break even" claims have already been held to be timely in the decision granting him leave to amend. As discussed above, I reject the plaintiff's contention that the decision granting leave to amend precludes consideration of the statute of limitations on summary judgment.

For the purposes of the statute of limitations, the filing date of Mr. Phillips's original action is September 7, 1986. *Phillips,* 782 F.Supp. at 859 (recognizing that Mr. Phillips' individual claims filed in July of 1987 were tolled for approximately ten months by the pendency of the *Kassover* action). Again applying the one year/three year limitation period, "if Mr. Phillips knew, or by the exercise of reasonable diligence should have known, of the alleged fraud prior to Septem-

**6.** There is no dispute that the action was brought within the three years of the defendant's alleged fraudulent conduct.

ber 7, 1985, his claims under the 1933 Act are time-barred." *Id.* On the first motion for summary judgment this Court held that a genuine issue of material fact existed as to whether Mr. Phillips was on inquiry notice as to the subject of his "shakeout" claims. *Id.* at 862. That opinion did not and could not have dealt with the question of whether Mr. Phillips was on inquiry notice with respect to the "break even" allegations prior to September 7, 1985. I now turn to that question.

■ The court may grant the defendant summary judgment as a matter of law if it determines that the "plaintiff was placed on notice of the probability of fraud, and he failed to exercise reasonable diligence in discharging that duty to inquire[.]" *Lenz v. Associated Inns and Restaurants Co.,* 833 F.Supp. 362, 371 (S.D.N.Y.1993). "A plaintiff in a federal securities case will be deemed to have discovered fraud for purposes of triggering the statute of limitations when a reasonable investor of ordinary intelligence would have discovered the existence of the fraud." *Dodds v. Cigna Securities, Inc.,* 12 F.3d 346, 350 (2d Cir.1993) (citations omitted), *cert. denied,* —— U.S. ——, 114 S.Ct. 1401, 128 L.Ed.2d 74 (1994).

■ The plaintiff argues that "[s]ince neither defendant nor CDI ever disclosed that a writedown of inventory caused the quarterly loss, plaintiff had no way to discover and was not on inquiry notice as to why CDI failed to 'break even' in the second quarter until he received documents in response to his subpoena *duces tecum* in May, 1994." Plaintiff's Memorandum of Law in Opposition to the Motion for Summary Judgment, at 7 n. 5. However, two documents available to all CDI shareholders in September of 1984 contradict this assertion. First, the Form 10–Q, "Quarterly Report Under Section 13 or 15(d) of the Securities Exchange Act of 1934" for the second quarter of 1984 attributes the losses to inventory adjustments:

> Cost of goods sold decreased and gross profit increased as a percentage of net sales from the second quarter and the first half of the last fiscal year to the same periods of the current fiscal year due to larger volumes of sales which enabled the Company to take advantage of higher lev-

els of price discounts from its suppliers. *However, for the second quarter and the first half of the current fiscal year the benefits of supplier price discounts were partially offset by greater than anticipated inventory adjustments* and by reduced margins on certain IBM products following price reduction announced by IBM in June, 1984.

*Id.* at 7 (emphasis supplied). Second, CDI's Second Quarter Report to Shareholders, mailed to all shareholders in September 1984, reported the loss of $482,000 for the second quarter and stated that "[a] principal factor in this year's second quarter loss was greater than anticipated inventory adjustments at the end of the quarter." Letter to Shareholders from Stephen B. Parker, Chairman, dated September 1984. The next issue, then, is to determine whether these reported losses gave the plaintiff adequate notice of his possible claims.

Losses reported in annual shareholder documents do not automatically place shareholders on notice of potential fraud. *Siebert v. Nives,* 871 F.Supp. 110, 114 (D.Conn.1994) (increase in loan loss reserves does not automatically trigger shareholder suspicion). In *Siebert* the Court rejected the defendants' claim that the disclosure of losses in the annual report put investors on notice, particularly in light of the reassuring statements elsewhere in the report. *Id.* at 114–15. Then–District Judge Cabranes noted:

> It surely cannot be the case that every annual report which records corporate losses signals some underlying fraud. While decreased profits and increased loan loss reserves may be consistent with fraud in some cases, they are also symptomatic of a variety of non-fraudulent ills, ranging from poor business judgment to unfavorable market conditions.

*Id.*

The size of losses is one factor in determining whether the shareholders received any warning signals. The courts have commented that generally only abnormally large losses would put investors on inquiry notice. *See, e.g., Boley v. Pineloch Associates, Ltd.,* No. 87 Civ. 5124 (JMW), 1990 WL 113201, at

*5 (S.D.N.Y. Aug. 2, 1990) (reported losses did not put investors on notice where "[t]he lower-than-projected occupancy and rental rates communicated by the quarterly reports could have easily been attributable to economic conditions beyond the defendants' control [and] [t]he divergence between the projections and performance was disappointing, but not alarming"); *cf. Bresson v. Thomson McKinnon Securities, Inc.,* 641 F.Supp. 338, 345 (S.D.N.Y.1986) (disclosure of projected losses, loss of investment banker, drastic reduction of work force, and planned sale of 33% of reserves put investors on notice of potential for omissions and misstatements in prospectus); *Anisfeld v. Cantor Fitzgerald & Co.,* 631 F.Supp. 1461, 1466 (S.D.N.Y.1986) (investors were on inquiry notice where partnership suffered large losses that increased every year since its inception and $1.4 million in advanced funds was necessary to stave off foreclosure).

The losses reported to the shareholders in this case (18 cent per share loss for the second quarter) were not of such magnitude as to trigger immediate suspicion. They were not accompanied by forecasts of imminent foreclosure, bankruptcy or other financial failure. Additionally, like the documents at issue in *Siebert,* the shareholders' report in this case included references to increased sales and expansion and made reassuring statements, such as "[t]here have been a number of favorable developments for Computer Depot that are not yet reflected in our financial results." The innocuous term "inventory adjustment" to which the above documents attribute losses did not constitute sufficient "storm warnings" to the plaintiff to commence inquiry into a potential fraud. Rather, not until the end of discovery did the plaintiff learn about the size of the inventory writeoff ($717,000) and what he alleges to be a complete lack of internal controls at CDI.

Therefore, the plaintiff's second quarter "break even" claims are not barred by the statute of limitations.

### C. *Section 10(b) and Rule 10b–5 Claims*

■ Section 10(b) makes it "unlawful for any person, . . . [t]o use and employ . . . any manipulative or deceptive device or contri-

vance" to violate rules and regulations of the Securities and Exchange Commission. 15 U.S.C. § 78j(b). Rule 10b–5 promulgated under this section prohibits any "artifice to defraud" or any act "which operates or would operate as a fraud or deceit." 17 C.F.R. § 240.10b–5.

To establish a claim under section 10(b) and Rule 10b–5 with respect to misleading disclosures, a plaintiff must show "(1) a misstatement or omission by the defendant; (2) as to a material fact; (3) upon which plaintiff relied; (4) and which caused damages. In addition, the plaintiff must show that (5) defendant acted with scienter; and that (6) the misstatement or omission was made in connection with the purchase or sale of a securities."

*In re Crazy Eddie Securities Litigation,* 817 F.Supp. 306, 310–311 (E.D.N.Y.1993) (quoting *Morin v. Trupin,* 778 F.Supp. 711, 717 (S.D.N.Y.1991)).

#### 1. *Primary Liability*

■ Kidder argues that it cannot be held liable under Section 10(b) in light of the recent Supreme Court decision in *Central Bank of Denver v. First Interstate Bank of Denver,* 511 U.S. 164, ——, 114 S.Ct. 1439, 1455, 128 L.Ed.2d 119 (1994), which abolished aiding and abetting liability under Section 10(b). The *Central Bank* opinion, however, did not completely absolve secondary actors in the securities market from liability. With respect to professionals, such as underwriters, the court held:

> Any person or entity, including a lawyer, accountant, or bank, who employs a manipulative device or makes a material misstatement (or omission) on which a purchaser or seller of securities relies may be liable as a primary violator under 10b–5, assuming *all* of the requirements for primary liability under Rule 10b–5 are met.

*Id.* at ——, 114 S.Ct. at 1455 (citation omitted).

In the aftermath of *Central Bank,* numerous lower courts have imposed primary liability on attorneys, accountants, and underwriters. *See, e.g., Adam v. Silicon Valley Bancshares,* 884 F.Supp. 1398, 1401 (N.D.Cal.1995) (accountants may be held pri-

marily liable based on financial statements, press statements, and report of issuer); *Cashman v. Coopers & Lybrand,* 877 F.Supp. 425, 432 (N.D.Ill.1995) (accountants who played "central role in drafting and formation of the alleged misstatements" may be held liable); *Employer Insurance of Wausau v. Musick, Peeler & Garrett,* 871 F.Supp. 381, 389 (S.D.Cal.1994) (attorneys may be held liable for "drafting and editing the offering document"; accountants may be held liable for playing "significant role" in creating prospectus); *In re ZZZZ Best Securities Litigation,* 864 F.Supp. 960, 970 (C.D.Cal. 1994) (accountants liable for statements in report approving prospectus); *but see In re Kendall Square Research Corp. Securities Litigation,* 868 F.Supp. 26, 28 (D.Mass.1994) (review and approval of representations in prospectus as to issuer's revenues did not "constitute making of a material misstatement" by accountants); *Vosgerichian v. Commodore International,* 862 F.Supp. 1371, 1378 (E.D.Pa.1994) (accountants who rendered "guidance and express approval" of alleged misrepresentations not liable).

The circuit and district courts are split in their approach to determining when to impose primary liability on professionals. The Ninth Circuit has adopted a "significant role" or "substantial involvement" test annunciated in *In re Software Toolworks, Inc. Securities Litigation,* 38 F.3d 1078, 1090 (9th Cir.1994), 50 F.3d 615, 628 n. 3, *cert. denied,* —— U.S. ——, 116 S.Ct. 274, 133 L.Ed.2d 195 (1995). Other courts have insisted that under *Central Bank* liability attaches only where the actor made a false or misleading statement that was communicated to investors. *See, e.g., Anixter v. Home–Stake Production Co.,* 77 F.3d 1215, 1226 (10th Cir.1996); *In re Kendall Square,* 868 F.Supp. at 28; *Vosgerichian,* 862 F.Supp. at 1378.

The Second Circuit Court of Appeals has not yet addressed this issue, and some district courts choose to impose liability based on conduct short of the actual making of the statement. For example, in *In re U.S.A. Classic Securities Litigation,* 93 Civ. 6667 (JSM), 1995 WL 363841 at *5 (S.D.N.Y. June 19, 1995), the court held that an underwriter's participation in issuance of the prospec-

tus was sufficient to state a claim of primary liability. Another court, while dismissing an aiding and abetting claim against underwriters, observed that its conclusion would have been different had the complaint alleged that the defendant "either made a fraudulent statement or disseminated a fraudulent statement made by ... others." *In re College Bound Consolidated Litigation,* 93 Civ. 2348 (MBM), 1994 WL 172408, at *4 (S.D.N.Y. May 4, 1994).

However, in *MTC Electronic Technologies Shareholders Litigation,* 898 F.Supp. 974, 986–87 (E.D.N.Y.1995), the court held that underwriters could not be held liable for misrepresentations in a prospectus purely on grounds that they had participated in drafting and circulating it. The Court concluded that

> if *Central Bank* is to have any real meaning, a defendant must actually *make* a false or misleading statement in order to be held liable under Section 10(b). Anything short of such conduct is merely aiding and abetting, and no matter how substantial that aid may be, it is not enough to trigger liability under Section 10(b).

*Id.* at 987 (emphasis supplied).

I need not decide here which approach to follow. Even under the more stringent test for determining primary liability, Kidder cannot claim the protection of *Central Bank.*

The Second Amended complaint reads in pertinent part:

> As the representative underwriters of the public offering, Kidder Peabody assisted in the preparation of the Prospectus, signed and certified the Registration Statement and was required to investigate with due diligence the representations contained therein to confirm that the Registration Statement and Prospectus did not contain materially misleading statements or omit to state material facts.

Am.Complaint, ¶ 60.

> [D]efendant, *singly* and in concert, directly or indirectly, engaged in a common plan, scheme and unlawful conspiracy and course of conduct, pursuant to which it knowingly or recklessly; engaged in acts, transactions, practices, and a course of

business which operated as a fraud upon the plaintiff and the other members of the class; *made various untrue statements of material facts and omitted to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading,* to plaintiff and the other class members; and employed manipulative and deceptive devices and contrivances in connection with the purchase or sale of securities.

Am.Complaint, ¶ 67 (emphasis supplied).

The false and misleading statements and omissions therefrom were done with the intent ... to aid and abet the deception and defrauding of plaintiff and the other class member[.]

Am.Complaint, ¶ 73.

Clearly, the allegations of aiding and abetting cannot stand in light of *Central Bank.* Similarly, liability based on allegations of conspiracy has been eliminated by that case. *See, e.g., Kidder Peabody & Co. v. Unigestion Int'l, Ltd.,* 903 F.Supp. 479, 496 (S.D.N.Y.1995) ("A careful reading of *Central Bank* dictates that its holding be applied to conspiracy as well as to aiding and abetting."). However, the amended complaint also alleges that the defendant itself made the purportedly misleading statements. Am. Complaint, ¶ 67 (underlined portion). This case is therefore distinguishable from *MTC* where the court found that "there is no allegation that [underwriter] made any of the allegedly fraudulent representations in that prospectus." *MTC,* 898 F.Supp. at 987. Thus, the plaintiff's allegations are sufficient to state the claim of primary liability under the *Central Bank.*

Nevertheless, the inquiry does not stop here. In order to avoid summary judgment, the plaintiff must demonstrate some factual dispute bearing on the issue of whether the defendant actually made the allegedly misleading statements. The plaintiff asserts that Kidder is directly responsible for drafting the language of the prospectus and therefore should be deemed to have "made" the statements at issue. In support of this argument he cites the deposition of Robert Stefan, a Kidder employee:

Q: Do you recall that the prospectus contains a forecast of the company breaking even, approximately breaking even for the second quarter fiscal '85?

A: I remember that *we made that statement.*

Q: And who actually made—drafted that language, do you recall?

A: It was the whole group of both the company, their counsel, our counsel. I think we all sat together and drafted the appropriate language.

Q: And that was the language that appeared in the first prospectus?

A: No, I think when—after the notification from IBM that they would—that their retailers would only receive partial price protection, I think we went back and tried to assess what impact that would have on both profit margins; and then ultimately, you know the net income for that quarter.

Q: And what was the result of that assessment?

A: I have looked at the language between the two, and I think *we modified our language so that we said in the last prospectus* that we expected the earnings to be approximately break even, as I recall.

Stefan Dep. at 78–79, attached as Exh. 4 to Pl.Supp. 3(g) Statement (emphasis supplied).

In light of this testimony, a reasonable fact finder could determine that Kidder and its employees actually made the allegedly misleading statements. Clearly, Kidder actively participated in formulating the language of the prospectus. It would be reasonable to conclude, therefore, that this conduct amounts to "making" the statement, even though the Prospectus was published in the name of the issuer.

The defendant urges an interpretation of *Central Bank* that would impose primary liability on the underwriters only for the statements that are directly attributable to them, or, put more simply, signed by them. Although some cases would support this in-

terpretation,[7] such a test would virtually always absolve the underwriters from liability under 10b-5. This is clearly not a result anticipated by the Court in *Central Bank*. Therefore, I find summary judgment on this ground inappropriate.

### 2. *Scienter*

■ The defendant claims that the plaintiff presented no evidence demonstrating that it acted with the required scienter. An underwriter may obtain summary judgment by showing that the plaintiff is unable to prove this essential element. *In re Software Toolworks, Inc. Securities Litigation*, 789 F.Supp. 1489, 1499 (N.D.Cal.1992), *aff'd in part and rev'd in part*, 50 F.3d 615 (9th Cir.1994); *Weinberger v. Jackson*, No. C-89-2301-CAL, 1990 WL 260676, at *3 (N.D.Cal. Oct. 11, 1990). The scienter requirement can be satisfied by demonstrating specific facts (1) showing a motive for committing fraud and a clear opportunity for doing so, or (2) indicating conscious or reckless behavior by the defendants. *San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Co., Inc.*, 75 F.3d 801, 813 (2d Cir.1996).

#### a. *Motive*

The plaintiff has failed to point to specific facts showing motive on the part of the defendant. "Motive would entail concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged." *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1130 (2d Cir.1994). Kidder did not receive any benefit from the offering except for the usual underwriter fee:

The sole compensation that Kidder received in connection with the Offering was an underwriter's fee. We shared that fee with Dain Bosworth, the other co-lead underwriter, and other members of underwriting group. Kidder employees were restricted from purchasing stock in the Offering and Kidder received no other benefits in connection with the offering.

Affidavit of Robert J. Stefan In Support of Defendant's Motion for Summary Judgment dated February 3, 1995 ("Stefan Aff."), ¶ 21. Aside from conclusory statements in his papers,[8] the plaintiff has not produced any evidence to the contrary. Such financial compensation alone does not establish motive. *See Friedman v. Arizona World Nurseries Ltd. Partnership*, 730 F.Supp. 521, 532 (S.D.N.Y.1990), *aff'd*, 927 F.2d 594 (2d Cir. 1991) (table).

#### b. *Recklessness*

The plaintiff recites a number of instances of the defendant's alleged recklessness or failure to exercise ordinary care. Although his submissions list eighteen issues of purportedly disputed fact, they can be boiled down to two major issues: (1) did Kidder review the board minutes and other information relevant to CDI's internal accounting controls or lack thereof; and (2) was Kidder reckless in affirming the Prospectus in light of the "industry shakeout."

#### i. *Board Minutes and Inventory Shrinkage*

■ According to the plaintiff, one of the main indicators of recklessness is Kidder's

At the inception of the offering in January 1984, ... Kidder ... claimed the offering price could be as high as $40-50 per share. As the offering date drew closer, the price began to decline precipitously. When the offering was "pulled" because of the IBM price reduction announcement in June 1984, the price declined even further to $9.00 per share. Had the offering been deferred until after the end of the second quarter and physical inventory count, there is little doubt that the offering price would have declined further, assuming it could have been completed at all.

Plaintiff's Memorandum of Law in Opposition to Defendant's Supplemental Memorandum of Law in Support of Defendant's Motion for Summary Judgment at 6-7.

---

7. For example, the accountants in *Anixter* were held primarily liable for the representation directly attributable to them, including opinions on the balance sheets and certification letters of issuer's financial statements which were reproduced in the prospectus, annual reports, registration statements and other promotional materials. 77 F.3d at 1227. Similarly, while the court in *MTC* dismissed the claim against underwriters based solely on participation in drafting of the prospectus, it left intact the claim predicated on dissemination of a research report about the issuer prepared by the underwriter. 898 F.Supp. at 987.

8. Plaintiff claims that Kidder's motive was to avoid losing the offering:

failure to review CDI's board minutes which should have alerted it to the absence of reliable inventory controls at CDI. The plaintiff argues that the lack of internal accounting controls made the forecast of future profitability false.

In support of this contention, the plaintiff cites the board minutes of January 19, 1984 which state that it was the consensus of CDI's directors that "until [CDI's] inventory is done and the shrinkage is determined, [they] ought to be very careful about releasing any figures on expected profits for the year." Minutes of Special Meeting of the Board of Directors dated January 19, 1984 attached as Exh. 12 to Plaintiff's Supplemental Rule 3(g) statement ("Pl. 3(g)"). Similarly, the March 2, 1984 minutes reflect the directors' belief that "this year, [CDI] had become an inventory intensive business which impacts the quality of earnings." Pl. 3(g), Exh. 13.

Notwithstanding his allusion to these "storm warnings", the plaintiff has failed to refute Kidder's proof that (a) Kidder employees reviewed the board minutes; (b) Kidder's outside counsel, Kirkland and Ellis, reviewed the board minutes; and (c) Arthur Anderson, CDI's outside auditor, represented to Kidder that it had reviewed the board minutes and found no material weakness in CDI's accounting controls. *See* Supplemental Affidavit of Robert J. Stefan In Further Support of Defendant's Motion for Summary Judgment dated Feb. 16, 1996 ("Stefan Supp. Aff.") ¶¶ 3, 4, 6, 7. The deposition testimony of former Kidder employees cited by the plaintiff is inconclusive, because it only demonstrates that these employees personally did not review the minutes, or did not recall whether they did it or not.[9]

Since the plaintiff cannot argue that Kidder or its agents failed to review the minutes, the only theory for proving scienter is that Kidder knew the information contained in the minutes and recklessly disregarded it. To prevail, the plaintiff must establish that the method of preparation of the financial prospectus was so egregious as to render its dissemination reckless. *CL–Alexanders Laing & Cruickshank v. Goldfeld,* 739 F.Supp. 158, 164 (S.D.N.Y.1990) (citation omitted).

The defendant claims that it conducted extensive due diligence which rendered a physical count of inventory unnecessary. In support of this claim it submitted an affidavit of Robert J. Stefan, an investment banker in the Corporate Finance Department of Kidder between 1981 and 1988. According to Mr. Stefan, Kidder engaged in the following forms of due diligence:

(1) analyzing and investigating CDI's business, including its marketing strategy, sources of supply and competitive position in computer retailing, including discussions and/or meetings with management, outside directors, suppliers, department stores, lending banks, accountants and lawyers;

(2) reviewing the Company's financial statements, forecasts, budgets, and accounting controls, including discussions and/or meetings with management, outside directors, accountants, suppliers, and lending banks;

(3) discussing with CDI's principal suppliers, IBM and Apple, the Company and its marketing strategy, competence of company management, prospects for expansion, and suppliers' intentions to increase production and allotments;

(4) reviewing CDI corporate documents, including its articles of incorporation, bylaws, board minutes, and 1983 private placement memorandum;

(5) analyzing the personal computer business, including the composition of its manufacturing, retail, and computer sectors, CDI's competition, and projections of the market's future size and profitability;

(6) researching the background and experience of CDI's management, outside directors, counsel, and outside auditors;

(7) reviewing and investigating CDI's lists of projected store openings, leases and letters of intent with host department stores;

(8) analyzing costs and expenses associated with opening and operating new com-

---

**9.** Additionally, the defendant points out that one of the quoted deponents was an employee of another entity, Dain Bosworth, and another deponent was a senior official at Kidder whose responsibilities did not include review of board minutes.

puter stores, including costs related to construction, financing of accounts receivable, and working capital requirements, and including meetings and/or discussions with management and accountants;

(9) discussing with management and outside authorities historic and projected performance of new stores, including working capital requirements, construction costs, and financing of accounts receivable;

(10) reviewing CDI's banking relationship, and verifying, among other things, banks' confidence in CDI and willingness to increase credit lines;

(11) reviewing and discussing with management and accountants the Company's projected performance for the second quarter of fiscal 1985;

(12) drafting, reviewing and commenting on drafts of the Registration Statement and Prospectus and correspondence with the SEC;

(13) reviewing IPO prospectuses of other personal computer retailers, comparing price/earnings multiples, monitoring those company's stock prices and obtaining clearance of IPO with various Blue Sky authorities;

(14) reviewing employment contracts, employee salaries, employee benefit plans, and employee training programs.

Stefan Aff., ¶ 4. In addition to the recital of due diligence, Kidder points to its good faith as demonstrated by the withdrawal of the initial offering to study newly available information that may have affected it. Affidavit of Frederick S. Larson in Support of Defendant's Motion for Summary Judgement dated Jan. 24, 1995 ("Larson Aff."), ¶¶ 5–6; [10] Stefan Supp.Aff., ¶¶ 15–16.[11] Furthermore, far from disregarding the adequacy of CDI's internal controls, Kidder conducted due diligence regarding inventory shrinkage:

> One subject of our discussions with Arthur Andersen involved the adequacy of CDI's inventory controls, including with respect to inventory "shrinkage." Arthur Andersen told us that it knew of no weaknesses with CDI's internal controls or inventory accounting.

> Arthur Andersen also represented that CDI's shrinkage was consistent with industry standards, and that its shrinkage reserve should be sufficient for its needs.

Stefan Supp.Aff., ¶¶ 6–7. Finally, the defendant refers to the ample cautionary language in the Prospectus itself.

Aside from alluding to the aforementioned board minutes, the plaintiff does not supply any specific facts that would suggest that Kidder acted egregiously. In his supplemental submissions the plaintiff relies on the affidavit of an accounting expert, Robert W. Berliner, who concludes that "a retailer such as CDI, which was experiencing significant inventory shrinkage historically would have needed to take a physical inventory in order to accurately determine the amount of inventory shrinkage." Affidavit of Robert W. Berliner dated April 15, 1996 ("Berliner Aff.") attached as Exh. A to Plaintiff's Memoran-

---

**10.** The affidavit states in relevant part:

The initial registration statement was withdrawn because of information the Company learned a day or so after the Offering went effective. Specifically, when we returned to Minneapolis on or about June 22, 1984 from a road show concerning the offering, we learned that IBM reduced prices on certain products and that, for the first time, IBM would limit "price protection" to products delivered to dealers within a limited time prior to the price reduction.

In conjunction with Arthur Andersen, our outside accountants, we calculated the anticipated effect that the IBM price reduction would have on the Company. That calculation was included in the new Prospectus.

**11.** The affidavit stated that following the IBM announcement Kidder sought and obtained from

Arthur Andersen a cold comfort letter attesting that Arthur Andersen

(i) reviewed the amount of credit for the price reduction identified by IBM, (ii) confirmed the accuracy of CDI's schedule listing all IBM merchandise in inventory and assessing the gross margin effect on all merchandise of the IBM announcement, (iii) reviewed the actual IBM Announcement identifying which products were affected by the price reduction and cross-referenced them against the Company's schedule, (iv) reviewed invoices and purchase information concerning IBM merchandise received since the last physical inventory count, (v) recomputed the per unit price reduction by product as the original invoice cost less the reduced price, and (vi) analyzed the before- and after-tax effects of the price reduction. Stefan Supp. Aff., ¶ 16.

dum of Law in Opposition to Defendant's Supplemental Memorandum of Law. However, conclusory declarations by a plaintiff's expert are generally not enough to defeat summary judgment. *CL–Alexanders Laing*, 739 F.Supp. at 164 ("while expert opinion may be helpful, summary judgment can be decided only by the allegation of specific facts"); *see also Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir.1989); *In re Adobe Systems, Inc. Securities Litigation*, 787 F.Supp. 912, 919–920 (N.D.Cal.1992), *aff'd*, 5 F.3d 535 (9th Cir.1993).

The issue here is not the strength or weakness of the CDI's accounting controls, but rather whether Kidder as the underwriter intentionally or recklessly closed its eyes to factors that rendered its statements false or misleading. "In other words, recklessness connotes defendant's knowledge that it does not have sufficient basis to speak." *CL–Alexanders Laing*, 739 F.Supp. at 163. In light of Kidder's uncontroverted evidence that it took into account all available information regarding the potential inventory shrinkage and other issues of internal accounting, scienter cannot be found. The courts in this and other circuits refuse to find scienter where the plaintiff has failed to demonstrate wilfulness or recklessness. *See, e.g., Stamatio v. Hurco Companies, Inc.*, 892 F.Supp. 214, 218 (S.D.Ind.1995) ("Even accepting as true Plaintiff's allegations that Defendant knew that it had inventory problems ... that fact standing alone does not show that Defendants knew that the statements in their prospectus or other representations were materially false or misleading at the time the material statements were made."); *In re Crazy Eddie Securities Litigation*, 817 F.Supp. at 316 ("[E]ven if plaintiffs could explain how the Underwriters might have discovered the fraud, plaintiffs fail to raise a genuine issue as to whether the Underwriters deliberately shut their eyes to the fraud."); *CL–Alexanders Laing*, 739 F.Supp.

at 163 ("to establish scienter through recklessness, it is not enough for plaintiff to establish that the method of preparation for the projections used simply was unreasonable").

### ii. *Industry Shakeout*

The analysis of Kidder's lack of recklessness applies to the plaintiff's "shakeout" claims with equal force. Kidder set forth sworn testimony that at the time of the Offering, it did not believe that CDI's prospects would be impaired by the market conditions or what plaintiff refers to as an industry-wide "shakeout." Stefan Supp.Aff. ¶ 18. Kidder's belief was based on its careful research of the personal computer retailing industry and exploration of what it believed to be CDI's unique competitive advantages. Stefan Supp.Aff. ¶ 18; Stefan Aff. ¶¶ 5–10, 15; Deposition of Theodore Berghorst attached as Exh. A to Supplemental Affidavit of Jack Levin In Further Support of Defendant's Motion for Summary Judgment dated Feb. 22, 1996 ("Levin Supp.Aff.") at 10–11, 25–28.

The plaintiff's only evidence to the contrary consists of two newspaper articles warning that the computer industry was slowing down and a reference to a section of the Board Minutes taken out of context. Pl. Supp. 3(g), Exh. 35–36, Exh. 13.[12] This is not enough to raise a triable issue of fact as to the defendant's recklessness.

Moreover, the defendant cannot be found reckless as a matter of law, because it had no duty to report readily available industry trends. *See In re Convergent Tech. Securities Litigation*, 948 F.2d 507, 513 (9th Cir. 1991) (no duty to disclose risk of obsolescence in computer industry); *Wielgos v. Commonwealth Edison Co.*, 892 F.2d at 515 (no duty to disclose effect of market conditions unless company affected differently from others similarly positioned); *In re Exabyte Corp. Securities Litigation*, 823 F.Supp.

---

12. The passage which the plaintiff's cite and which mentions nothing about the market shakeout reads in full:

> The directors pointed out that more stores want us than we can handle. It was pointed out that this year, Computer Depot had become an inventory intensive business which

impacts the quality of earnings. We have a problem which is not operational and that is to identify a successful formula for managing assets. We will need to be back to the investors for more money next year.

CDI Board Minutes dated March 2, 1984, Pl. Supp. 3(g), Exh. 13 at 3.

866, 871 (D.Colo.1993) (no duty to report "general economic conditions" affecting market).

Thus, I find that the plaintiff has failed to identify a genuine issue of fact concerning whether the defendant deliberately or recklessly disregarded either the evidence of inadequate internal accounting controls that purportedly caused losses to the plaintiff or the industry-wide "shakeout." The defendant's motion for summary judgment with respect to claims arising under section 10(b) and Rule 10b–5 is therefore granted.

### D. *Sections 11 and 12(2) Claims*

Section 11 imposes liability where "any part of [a] registration statement ... contain[s] an untrue statement of a material fact or omits[s] to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k(a). Section 12(2) makes it unlawful to create and disseminate a prospectus "which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading." 15 U.S.C. § 77*l* (2).

#### 1. *Alleged Omissions*

█ The plaintiff claims that the Prospectus contains a number of omissions of material fact. An omission is material if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic, Inc. v. Levinson,* 485 U.S. 224, 231–32, 108 S.Ct. 978, 983, 99 L.Ed.2d 194 (1988). The court can award summary judgment where it finds that the prospectus actually discloses purportedly omitted facts. *Kas v. Financial General Bankshares, Inc.,* 796 F.2d 508, 515 (D.C.Cir.1986); *In re Quarterdeck Office Systems, Inc. Securities Litigation,* 854 F.Supp. 1466, 1471 (C.D.Cal.1994).

##### a. *Market Shakeout*

##### i. *Decrease in Prices*

█ The plaintiff alleges that Kidder failed to adequately disclose "the rapidly changing material adverse circumstances of the personal computer market, *inter alia,* that there was significant price-cutting and a slackening in the growth of demand for personal computers ... which caused a shakeout in the personal computer market." Am.Complaint, ¶ 59(a). It further alleges that CDI failed to adequately disclose the negative effect of the price decreases on CDI's profitability, including the profitability of its new stores. Am.Complaint, ¶ 59(c).

However, the Prospectus cautions investors about the volatility of the personal computer field and its effect on the company. Specifically, it states: "The Company operates in an economic environment influenced by several factors peculiar to the manufacture and distribution of personal computers. These factors include product proliferation, rapid technological change, *decreasing prices,* dramatic growth of demand, and the emergence of various channels of distribution." CDI's Prospectus ("Prospectus") attached as Exh. B to Affidavit of J. Jay Lobell In Support of Defendant's Motion for Summary Judgment dated Jan. 24, 1995 ("Lobell Aff.") at 9 (emphasis supplied). It also reveals that "[t]he personal computer industry is characterized by a rapid rate of technological change, *decreasing prices* and product obsolescence, *which may adversely affect the value of existing inventories* ", Prospectus at 4 (emphasis supplied), and that *"[t]he prices of computers and related products have generally declined* since their introduction." Prospectus at 11 (emphasis supplied). Even if the Prospectus had not explicitly revealed the conditions in the industry, however, the defendant could not have been held liable for such an omission, because, as noted above, it had no duty to report readily available industry trends. *See In re Convergent Technologies Securities Litigation,* 948 F.2d at 513; *In re Exabyte Corp. Securities Litigation,* 823 F.Supp. at 871.

The plaintiff relies on Judge Kram's statement in an earlier opinion that "the thrust of Phillips' complaint is not the failure to disclose the impending shakeout in the personal computer industry, but rather the shakeout's effect on CDI." *Phillips,* 782 F.Supp. at 862.

However, even though the underwriter must disclose firm-specific information, liability attaches only where an underwriter withheld data "from which forecasts are typically derived." *In re VeriFone Securities Litigation*, 11 F.3d 865, 869 (9th Cir.1993). In *Wielgos v. Commonwealth Edison Co.*, the court dismissed similar allegations, stating:

> Securities laws require issuers to disclose *firm-specific* information; investors and analysts combine that information with knowledge about the competition, regulatory conditions, and the economy as a whole to produce a value for stock. Just as a firm needn't disclose that 50% of all new products vanish from the market within a short time, so Commonwealth Edison needn't disclose the hazards of its business, hazards apparent to all serious observers and most casual ones.

892 F.2d at 515 (internal citations omitted).

### ii. *Increased Competition*

 The plaintiff claims that Kidder failed to disclose intensified competition in the industry, particularly from the increase in mass discount stores, and its effect on CDI's profitability and expansion. Am.Complaint ¶¶ 59(e)-(f), 58(b). Specifically, the plaintiff alleges that given this competition, the forecast of opening 49 new stores in the remaining quarter of 1984 and 90 new stores in 1985 was misleading and unrealistic. Am.Complaint ¶ 59(e).

The Prospectus, however, does disclose that "the retailing of personal computers is highly competitive" and lists large franchised retailers of computers as well as department stores with which CDI competes. Prospectus at 5. It further forecasts that "[a]s distribution channels for personal computers become more fully developed, [CDI] may also face greater competition" and that "[m]any of the [CDI's] competitors have longer operating histories, more locations, or greater financial and other resources than [CDI]." *Id.* Other parts of the Prospectus note the increase in third party distributors and emergence of various channels of distribution, including mass merchandisers and department stores. Prospectus at 9, 11.

### b. *Expansion: Opening of New Stores*

The plaintiff alleges that Kidder failed to disclose that CDI "was experiencing increased [selling, general, and administrative] expenses as a result of charges associated with hiring new employees before stores opened, as well as increased interest expenses." Am.Complaint ¶ 59(h). However, the "Selling, General and Administrative Expenses" section of the Prospectus reads:

> While selling, general and administrative expenses as a percentage of net sales declined significantly in fiscal 1983 and 1984 compared to fiscal 1982, the dollar amounts increased substantially. In addition, such expenses increased both as a percentage of net sales and in dollar amount from the first quarter of fiscal 1984 to the first quarter of fiscal 1985. These increases principally reflect higher expenditures for employee wages and benefits due to the hiring of additional sales and management personnel for computer centers and additional corporate management, administrative and technical staff, all personnel for computer centers and additional corporate management, administrative and technical staff, all associated with the expansion of the number of computer centers. These additional costs related to expansion are expected to affect earnings during the second quarter of fiscal 1985.

Prospectus at 10. Elsewhere, the Prospectus mentions the "increased levels of selling, general and administrative expenses anticipated to be incurred in the second quarter of the current fiscal year, substantially all of which are attributable to new stores to be opened in the last six months of the year." Prospectus at 12.

 The plaintiff further alleges that Kidder failed to disclose that CDI could not achieve profitability from its expansion "as it expanded without regard to location of host department stores or location within department stores." Am. Complaint ¶ 59(i). Finally, the plaintiff alleges that Kidder failed to disclose adequately that opening of the new stores "would drain the Company's assets and likely require it to seek the protection of the bankruptcy laws". Am. Complaint ¶ 59(d).

The defendant, however, offers uncontroverted evidence that new stores did achieve profitability within a short time of opening. Larson Aff. ¶ 9; Form 10–Q Filing dated October 27, 1984 attached as Exh. 10 to Pl.Supp. 3(g); Form 10–K dated February 2, 1985 attached as Exh. 11 to Pl.Supp. 3(g).

### c. *Losses Preceding Offering*

■ The plaintiff alleges that Kidder failed to disclose that CDI "had sustained substantial losses in the thirteen weeks immediately preceding the effective date of the offering." Am. Complaint ¶ 59(b).

The defendant proffers sworn testimony that no losses took place prior to the offering and that all losses for the second quarter are attributable to the mistaken inventory count which was promptly corrected by the company. Larson Aff. ¶ 12. Specifically, Kidder asserts that an incorrect inventory count on July 28, 1984 resulted in a writedown of $719,000 and reported loss of $420,000. Larson Aff. ¶ 13. The subsequent count resulted in an upward adjustment of $819,000. Pl. Supp. 3(g), Exh. 25 at 8.

The plaintiff contends that "[a] disputed issue of material fact concerns whether CDI sustained substantial losses in the quarter preceding the IPO." Pl.Supp. 3(g) at 28. However, it fails to cite a single item of evidence that would support this claim. The only relevant document cited suggests merely that CDI's internal accounting procedures should have been improved:

> The Client also maintains a perpetual inventory which, though costed out, has absolutely no semblance to Book inventory, and any type of reconciliation is nonexistent.... Actual reporting of monthly balances was noted to be a lot less intelligible, resulting from a very high frequency of adjustments, reversals, reclassification, mislabeling of accounts, etc.

Norwest Collateral Audit Memorandum dated May 15, 1985, Pl.Supp. 3(g), Exh. 25 at FB957. The assertion that some losses were sustained in the thirteen weeks prior to the IPO is thus mere speculation.

### d. *Internal Controls*

The plaintiff alleges that Kidder failed to disclose that CDI "had inaccurate internal controls necessary to value its inventory and accurately report its financial results" including the break even forecast. As with determination of scienter, the question for the Court is not whether CDI's internal accounting was adequate. Rather, the Court must determine whether Kidder, as an underwriter, could reasonably affirm the Prospectus in light of the information it had regarding CDI's operations.

■ Even assuming that Kidder's failure to disclose a lack of internal controls amounted to an omission or misrepresentation, underwriters are entitled to an affirmative "due diligence" defense if they establish that they conducted a reasonable investigation and "had reasonable ground to believe and did believe" that the prospectus contained no omissions or misrepresentations. 15 U.S.C. § 77k(b)(3), 77*l* (2). The question of due diligence can be resolved on summary judgment. *In re Software Toolworks, Inc. Securities Litigation,* 50 F.3d at 622 (collecting cases).

■ As discussed above, Kidder conducted extensive due diligence. Stefan Aff. ¶ 4. Furthermore, in affirming the Prospectus, it relied in large part on the cold comfort letters provided by Arthur Andersen which represented that the internal accounting controls were adequate. Therefore,

> [a]s a result of ... due diligence the underwriters reasonably believed the accuracy of the information contained in the prospectus, including the information alleged to be misrepresented or omitted here. The underwriters had no knowledge of any misrepresentations or omissions, and their work met the standards of due diligence and reasonable investigation required by sections 11 and 12(2).

*Weinberger,* at *3 (summary judgment for underwriters despite allegations that they knew that the issuer could not meet its projected gross revenue).

Moreover, some courts reject the notion that flaws in internal accounting warrant disclosure. For example, in *Monroe v. Hughes,*

31 F.3d 772 (9th Cir.1994), the court refused to impose liability on the accountants for failure to disclose internal control deficiencies:

> Appellants ... contend that the control deficiencies should have been noted on the audit report. Neither applicable professional standards, nor any legal authority of which we are aware, however, treat deficiencies in internal controls of a company as material to the audit report itself. ... We see no basis for holding that they should be regarded as material for purposes of § 11, which concerns matters that would have significance to the purchaser of securities in understanding what is being purchased.

*Id.* at 775 (citations omitted). *See also In Re Crazy Eddie,* 817 F.Supp. at 315 (underwriter owes no duty to disclose its conclusions that issuers had insufficient and unreliable controls, audit procedures and computer system).

### 2. *Misrepresentations*

The plaintiff alleges that the defendants misrepresented the following facts: (1) that CDI would break even in the second quarter; (2) that CDI planned to open 49 new stores in 1984 and 41 in 1985, all of which would generate sales and achieve profitability; (3) that expansion would require addition financing which may include borrowing; (4) that IBM's announcement would impact the gross margins for by the second and third quarter by $164,000; and (5) that CDI would be able to remain competitive despite the overall conditions in the personal computer market. Essentially, the plaintiff reiterates its argument that the above statements in the Prospectus are false or misleading in light of the weakness in CDI's internal accounting and its susceptibility to the market shakeout.

The defendant argues that the alleged misrepresentations are not actionable because they are "forward looking statements" rather than guarantees, and are not actionable under the "bespeaks caution" doctrine. A court may award summary judgment to the underwriters if it determines "as a matter of law ... that the defendants' forward looking representations contained enough cautionary language or risk disclosure to protect the defendant against claims of securities fraud." *In re Worlds of Wonder Securities Litigation,* 35 F.3d 1407, 1413 (9th Cir.1994), *cert. denied,* —— U.S. ——, 116 S.Ct. 185, 133 L.Ed.2d 123 (1995) (citation omitted). The next step of the analysis, then, is to determine whether the Prospectus contains sufficient cautionary language to render the statements general forward looking projections rather than false or misleading guarantees.

The Prospectus states that, "each investor should carefully consider certain risk factors associated with this offering before making any investment decision." Affidavit of J. Lobell ("Lobell Aff."), Exh. B. The special considerations section of the Prospectus listed these risk factors as: (1) the limited operating history and market information available for the company, including information regarding the long-term size and nature of the market for the products sold by CDI; (2) CDI's expansion plans which were dependent upon the availability of suitable space, the approval of individual store locations by principal suppliers, CDI's ability to hire and train personnel, and the availability of additional financing; (3) the rapid rate of technological change, decreasing prices, and product obsolescence that could adversely affect the value of existing inventories; and (4) CDI's dependence upon IBM and Apple as suppliers. *Prospectus* at 4. These statements served the purpose of communicating to prospective CDI stock holders that various elements must fall into place in order for the company to achieve its maximum profitability.

Statements in a prospectus are not actionable unless they are *guarantees of performance and not opinions. See Friedman v. Mohasco Corp.,* 929 F.2d 77, 78–79 (2d Cir. 1991); *Hershfang v. Citicorp,* 767 F.Supp. 1251, 1257 (S.D.N.Y.1991). The Court in *Friedman* specifically stated that "the documents expressed no guarantee of market value and referred only to the advisor's opinion of expected value". *Id.* at 78. Securities Exchange Rule 175 states in relevant part:

> a statement ... which is made by or on behalf of an issuer ... shall be deemed not

to be a fraudulent statement ... unless it is shown that such statement was made or reaffirmed without a reasonable basis or was disclosed other than in good faith.... [A] "fraudulent statement" [is] a statement which is an untrue statement of a material fact, a statement false or misleading with respect to any material fact, an omission to state a material fact necessary to make a statement not misleading, or which constitutes the employment of a manipulative, deceptive or fraudulent device[.]

17 C.F.R. § 230.175.

"[A]n underwriter must make an adequate investigation of an issuer's financial soundness and prospects and must disclose materially adverse information to the potential investors. Failure to carry out a reasonable investigation will render the underwriter liable for material misrepresentations which such an investigation would have uncovered." *Ades v. Deloitte & Touche,* Nos. 90 Civ. 4959 & 90 Civ. 5056 (RWS), 1993 WL 362364, at *19 (S.D.N.Y. Sept. 17, 1993) (citing *Feit v. Leasco Data Processing Equip. Corp.,* 332 F.Supp. 544, 582 (E.D.N.Y.1971)). As discussed in the previous sections, Kidder conducted extensive due diligence prior to affirming the Prospectus. With respect to the "shakeout" claims, Kidder claims relied on a report issued by Future Computing Incorporated in making an analysis of the personal computer market. The report states:

> [t]he hardware market will grow from $10 billion in 1984 to over $31 billion in 1989 for a compound annual growth of over 25%. The hardware forecast includes personal computers and add-on peripherals bought initially and after market peripherals. The software market will grow by over 29% per year and will reach $8 billion in 1989, up from $2.2 billion in 1984.

Stefan Aff., Exh. B at 1:7.

With respect to the claims regarding profitability, Kidder states that it based its affirmation of CDI's "price competitiveness" on the following: (1) a belief that CDI enjoyed a distinct competitive advantage because of its natural growth potential and its position as the largest retailer selling personal computers in leased department store space, Stefan Aff. ¶ 8; (2) CDI's past success with new computer centers, Stefan Aff. ¶ 16, Exh. C; (3) CDI's historical financial results and pricing information with respect to other retailers, Stefan Aff. ¶ 17; and (4) a belief that CDI enjoyed a distinct competitive advantage because of the IBM and Apple products it featured. The sale of these products averaged 70% of total sales. Stefan Aff. ¶ 9.

In light of the cautionary language in the Prospectus and the fact that the plaintiff has failed to raise any material issue of fact showing that Kidder did not have a reasonable basis for affirming the statements in the Prospectus, summary judgment is granted on the Section 11 and 12 claims.

*Conclusion*

For the reasons stated above, the plaintiff's class claims are barred by the statute of limitations and summary judgment for the defendant is appropriate on all individual claims. The Clerk of Court shall enter judgment dismissing the complaint.

SO ORDERED.