William H. ADDEO and Lisa
Addeo, Plaintiffs,

v.

David BRAVER and Braver, Stern
Securities Corp., Defendants.

No. 95 Civ. 4649(SS).

United States District Court,
S.D. New York.

Feb. 6, 1997.

Bernstein, Litowitz, Berger & Grossman, New York City, Douglas M. McKeige, for Plaintiffs.

Stroock & Stroock & Lavan, New York City, Melvin A. Bosterman, for Defendants.

## OPINION AND ORDER

SOTOMAYOR, District Judge.

Plaintiffs in this action, Lisa and William Addeo, brought suit against David Braver for alleged securities fraud in connection with defendant's management of a discretionary trading account opened by plaintiffs in 1991. Plaintiffs contend that defendant misled them as to a variety of matters bearing upon their account, thereby creating the false impression that a conservative investment strategy was being pursued on plaintiffs' behalf When it became clear to plaintiffs that defendant had actually made risky and imprudent investments with their funds, plaintiffs liquidated their account, and sustained significant losses.

Defendant brings this motion for summary judgment, arguing that plaintiffs' federal claims are barred by the applicable statute of limitations. As for an allegation that defendant failed to reveal a conflict of interest pertaining to certain of his investment advice, defendant maintains that plaintiffs have offered no evidence from which a jury could conclude that plaintiffs sustained damages as a result of the omission. For the reasons that follow, defendant's motion is granted.

## BACKGROUND

### The Relationship Between The Parties

In the early 1990's, Lisa Addeo began earning a significant salary, and sizeable bonuses, in her capacity as an officer and employee with Steinhardt Management Company and as a general partner with Steinhardt Partners and Institutional Partners. Though the parties do not agree on whether Mrs. Addeo is a sophisticated investor, she is—at a bare minimum—a college educated woman accustomed to substantial responsibility in the world of high finance. Along with her husband, Mrs. Addeo decided to secure her new found wealth by pursuing a conservative investment strategy. It was in connection with this decision that the Addeos became involved with the defendant, a broker employed by MKI Securities, Inc ("MKI").

In January 1991, the Addeos opened an account with MKI, which was subsequently transferred to Braver Stem Securities Corp., and gave defendant full discretion to trade on their behalf. According to plaintiffs' allegations, they advised defendant that they sought to avoid placing their funds at any significant risk. (L. Addeo Aff. ¶ 4). Over the first two to three years of the parties' relationship, defendant invested plaintiffs' money primarily in United States Government Agency bonds. These low risk investments, according to plaintiffs, were appropriate for the conservative approach they desired to take, and paid off in substantial interest earned on their account. This conservative strategy, however, apparently gave way to a more aggressive, and more risky, approach beginning in early 1993.

### The Alleged Fraud

Plaintiffs allege that, beginning in 1993, defendant urged plaintiffs to make significant purchases on margin, i.e., on borrowed money. (L. Addeo Aff. ¶ 7). At around the same time, defendant also began investing substantial amounts of the funds in plaintiffs' account—borrowed and otherwise—in a more risky variety of bonds, "inverse floaters," than he had previously purchased on their behalf. In advising plaintiffs on this new course, defendant assured plaintiffs that their investments were still safe, and that they could remain confident that their bonds would mature in four to five years. According to plaintiffs, however, defendant omitted to mention, and misrepresented, several important facts and considerations.

As noted, throughout the course of his dealings with plaintiffs, defendant allegedly assured them that their investment was extremely safe, and that their bonds were certain to pay off in full within four to five years. In fact, and unbeknownst to plaintiffs, there was no basis for any such guarantee, particularly in connection with the "inverse floaters" that defendant purchased beginning in 1993. As explained by plaintiffs in their Complaint, "[t]hese securities were highly illiquid and the average maturities of these securities was not fixed but would substantially increase (far beyond 4–5 years) if interest rates increased." (Complaint ¶ 27). This exposed plaintiffs to the risk that the value on their account would fluctuate far beyond anything ever suggested by defendant, and that they would not be able to sustain such fluctuations with the assurance of a full return within the narrow four to five year window emphasized by defendant. At oral argument, plaintiffs also highlighted defendant's alleged failure to alert them to the risk of a margin call, a scenario in which plaintiffs would have to increase their investment in order to avoid a complete, or near complete, loss on their account. In sum, plaintiffs complain that they were promised a conservative portfolio, but were left with a variety of "highly sophisticated and complex securities" candying an "extreme risk" of loss associated with high sensitivity to changing interest rates. (Id. ¶¶'s 43, 52).

Aside from misleading plaintiffs as to the particular risks associated with their investments, defendant also allegedly failed to disclose to plaintiffs a possible conflict of interest he had in recommending certain of the investments. (Complaint ¶ 30). In connection with those of plaintiffs' investments made on margin, defendant recouped a .25% commission on interest payments by plaintiffs to Bear Stems, the brokerage firm where plaintiffs' account was held. Defendant ultimately earned approximately § 7,000 pursuant to this arrangement.

Though plaintiffs allege that they were unaware of any of the aforementioned risks associated with their account, they were concerned, in early 1993, by the fact that the "names of the bonds in their account began to change." (Opposition at 7; L. Addeo Aff. ¶ 7). They also were generally uncomfortable with the notion of investing on margin. Not satisfied with defendant's assurances during a series of phone calls over the course of the year, plaintiffs arranged a face-to-face meeting with defendant to reiterate their desire that their funds be invested safely and conservatively. During this meeting, which took place in the summer of 1993, defendant assured plaintiffs that their portfolio was extremely safe. Defendant told plaintiffs that they should not be concerned by any market fluctuations that might occur in the extreme short term, because their bonds were certain to pay off in full in four to five years. When asked by plaintiffs how it was that he earned money on their account, defendant failed to mention his commission tied to margin investments; defendant instead indicated generally that lie recovered a small spread between the prices that his firm paid for bonds and the prices at which he sold the bonds to plaintiffs' account. In short, defendant assuaged plaintiffs' concerns by persisting to mislead them with respect to the status of their account and his personal incentives in connection with that account. It appears, however, that plaintiffs were not placed fully at ease; they disregarded defendant's advice that they continue investing on margin, and instructed him, in early 1994, to make no more of these purchases on their account. (L. Addeo Aff. ¶ 15).

In 1994, interest rates increased, and the market value of the bonds in plaintiffs' account began to decline. Plaintiffs contend that they were unaware of their losses until the Fall of 1994, at which time they confronted defendant with their concerns. Defendant conceded that plaintiffs' account had declined in value, but he maintained that their bonds would pay off, in full, in four to five years. By this time, however, plaintiffs had lost confidence in defendant. They consulted a friend from Mrs. Addeo's office regarding their investments, and were informed that there was no basis for defen-

dant's promise of a four to five year maturity on the bonds. Upon further investigation, plaintiffs determined that defendant had exposed them to the risk of a complete loss on their account. Fearful of losing their "nest egg," plaintiffs liquidated their bonds, in December 1994, recovering approximately $ 900,000. They subsequently commenced this action on June 21, 1995.

*The Disclosures*

Throughout the time that defendant was investing on plaintiffs' behalf, plaintiffs were receiving prospectuses and account statements concerning their holdings. Defendant contends that these materials were replete with information which directly contradicted his alleged misrepresentations.

Plaintiffs received a series of at least seven prospectuses in 1993 and early 1994. On the cover page of these materials, "Final Payment Date[s]" are listed for several of plaintiffs' bonds; these dates routinely extend well beyond the four to five year maturity promised by defendant. (See Bolton Aff. Ex.'s L–R). For instance, one prospectus refers to a "Final Payment Date" in the year 2024 on one of the bonds purchased on plaintiffs' account. (Bolton Aff. Ex. L, at AD00143). This same report provided that there was no assurance that a secondary market would develop for plaintiffs' bonds, and that it was therefore possible that investors would "not be able to sell their Multiclass PC's readily or at prices that will enable them to realize their desired yield." (*Id.* at AD00144). The prospectus also noted that the value of plaintiffs' securities, and their rate of return, could fluctuate over time in connection with changing interest rates and other market forces. (*Id.*).

The prospectuses also included more general warnings. For instance, plaintiffs were cautioned that "Multiclass PC's are not appropriate investments for any investor that requires a single lump sum payment on a predetermined date or an otherwise certain payment stream." (Bolton Aff. Ex. L at AD00157). Also, it was indicated that:

MULTICLASS PC'S ARE NOT SUITABLE INVESTMENTS FOR ALL INVESTORS. IN PARTICULAR, NO

INVESTOR SHOULD PURCHASE MULTICLASS PC'S OR ANY CLASS UNLESS THE INVESTOR UNDERSTANDS AND IS ABLE TO BEAR THE PREPAYMENT, YIELD, AND LIQUIDITY RISKS ASSOCIATED WITH THAT CLASS.

(*Id.* at AD00144). Plaintiffs were provided additional information in monthly account statements they received for the period between 1991 and 1994, as well as in purchase confirmations and Form 1099's for 1993 and 1994. (Bolton Aff. Ex.'s S–T). Most notably, these materials displayed "maturity dates" for certain bonds purchased on plaintiffs' behalf that extended well beyond the four to five year period which defendant had guaranteed. (*See, e.g.,* Bolton Aff. Ex. S, AD00810).

In sum, plaintiffs received a variety of materials which contained information directly contrary to certain of defendant's representations, and which were inconsistent with the high level of confidence he displayed in the investments he made on plaintiffs' behalf Plaintiffs contend, however, that they never thoroughly reviewed these materials, and that—in any event—the information contained therein did not even hint at the magnitude of those risks to which plaintiffs had actually been exposed.

## DISCUSSION

### I. Summary Judgment

Rule 56(c), Fed.R.Civ.P., provides that summary judgment is appropriate if:

> the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Pursuant to this provision, it is the Court's responsibility to perform "the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *McNeil v. Aguilos,* 831 F.Supp. 1079, 1082 (S.D.N.Y. 1993) (quoting *Anderson v. Liberty Lobby,*

*Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986)).

The responding party "must set forth facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). A summary judgment motion cannot be defeated through mere speculation or conjecture. *Pollis v. New School for Social Research,* 829 F.Supp. 584, 586 (S.D.N.Y.1993) (citing *Western World Ins. Co. v. Stack Oil, Inc.,* 922 F.2d 118, 121 (2d Cir.1990) (other citations omitted)). Rather, the responding party must show the existence of a disputed material fact in light of the substantive law. *Anderson* at 248, 106 S.Ct. at 2510. In determining whether a genuine issue of material fact exists, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *McNeil,* 831 F.Supp. at 1082 (citing *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962) (per curium) (other citations omitted)). *See also Coach Leatherware Co., Inc. v. AnnTaylor, Inc.,* 933 F.2d 162, 167 (2d Cir.1991) (citations omitted).

### II. Rule 10b–5

■ In support of their claim of securities fraud, plaintiffs invoke Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5 promulgated thereunder, 17 C.F.R. 240.10b–5. In order to prevail under these provisions, plaintiffs must establish that defendant; i) acting with scienter, ii) made a misstatement or omission, iii) of material fact, iv) which plaintiffs relied upon, and v) which caused plaintiffs damages. *See Burke v. Jacoby,* 981 F.2d 1372, 1378 (2d Cir.1992), *cert. denied,* 508 U.S. 909, 113 S.Ct. 2338, 124 L.Ed.2d 249 (1993).

#### A. Statute of Limitations

■ The Supreme Court has determined that plaintiffs pursuing claims under Rule 10b–5 must bring those claims within one year from their discovery of the alleged fraud and in any event no later than three years from the date of the alleged violations. *See Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,* 501 U.S. 350, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991); *see also Ceres*

*Partners v. GEL Associates,* 918 F.2d 349, 361 (2d Cir.1990). "A plaintiff in a federal securities case will be deemed to have discovered fraud for purposes of triggering the statute of limitations when a reasonable investor of ordinary intelligence would have discovered the existence of the fraud." *Dodds v. Cigna Securities, Inc.,* 12 F.3d 346, 350 (2d Cir.1993), *cert. denied,* 511 U.S. 1019, 114 S.Ct. 1401, 128 L.Ed.2d 74 (1994). This test is an "objective" one, implicating the concepts of inquiry notice and constructive knowledge. *Id.; see also Lenz v. Associated Inns & Restaurants Company of America,* 833 F.Supp. 362, 370 (S.D.N.Y.1993).

▮▮▮ "[W]hen the circumstances would suggest to an investor of ordinary intelligence the probability that she has been defrauded, a duty of inquiry arises, and knowledge will be imputed to the investor who does not make such all inquiry." *Dodds,* 12 F.3d at 350; *see also Armstrong v. McAlpin,* 699 F.2d 79, 88 (2d Cir.1983). This 'inquiry notice' is triggered by "financial, legal or other data available to plaintiff providing ... sufficient storm warnings to alert a reasonable person to the [probability] that there were either misleading statements or significant omissions involved in the sale of the [securities]." *Lenz,* 833 F.Supp. at 370 (citations omitted). Once such 'storm warnings' appear, plaintiffs must exhibit "reasonable diligence" in investigating the possibility that they have been defrauded. *See Dodds,* 12 F.3d at 350; *see also Lenz,* 833 F.Supp. at 370. If they fail to meet this obligation, plaintiffs will be held to have had "constructive knowledge" of the fraud against them. *Id.*

▮▮ Thus, determining the appropriate date for the accrual of a claim under Rule 10b–5 involves a two step inquiry. First, the Court must determine whether plaintiffs were placed on inquiry notice of the fraud against them by any of the materials they were provided. If so, the Court must then determine whether plaintiffs exercised "reasonable diligence" in investigating the potential for a claim. If they did not, they will be held to have possessed "constructive knowledge" of the fraud against them. *See Lenz,* 833 F.Supp. at 370; *see also Butala v.*

*Agashiwala,* 916 F.Supp. 314, 318 (S.D.N.Y. 1996).

### 1. Inquiry Notice

The question of 'inquiry notice' itself involves two levels of analysis. Because plaintiffs argue that they did not read the prospectuses and other materials made available to them in connection with their account, it is necessary to determine whether plaintiffs must nevertheless be held responsible for the contents of those materials. If the Court concludes that plaintiffs were on notice of the information that was provided to them, it becomes necessary to determine whether that information included sufficient "storm warnings" of the alleged fraud to place plaintiffs under a duty to investigate defendant's conduct.

▮▮ The first of these matters—plaintiffs' responsibility for the information included in those materials provided to them, but unread by them—is easily resolved. For purposes of determining the appropriate date for the accrual of a claim under Rule 10b–5, "[t]he means of knowledge are the same thing in effect as knowledge itself." *See Armstrong,* 699 F.2d at 88; *see also Dodds,* 12 F.3d at 350. The Court sees no reason, in the circumstances of this case, to depart from this simple rule. Though the parties quibble over the extent of plaintiffs' investment knowledge and savvy, suffice it to say that Mrs. Addeo was an educated woman, of considerable professional stature, who could be expected to read and review materials provided to her in connection with substantial investments being made on her behalf The Second Circuit has required no less from a "45 year-old [widow] with a tenth grade education." *Dodds,* 12 F.3d at 347 (affirming dismissal of securities fraud claim by plaintiff charging that she was induced to invest in securities that were more risky than she desired).

▮▮ Plaintiffs contend that, even if they were responsible for the information contained in those written materials provided to them in connection with their account, that information was insufficient to place them on inquiry notice of the full extent of defen-

dant's fraud against them. In other words, the prospectuses and other materials might have revealed certain of defendant's lies, but not nearly all of them. For instance, it was revealed that, contrary to defendant's assurances, plaintiffs' bonds could not be expected to mature for several years. As plaintiffs insist, however, none of the identified materials detailed the risk that their margin interest and tax payments could grow to exceed their investment income, and that a resulting margin call would leave plaintiffs in the position of having to infuse additional funds into their account in order to avoid a complete loss on their investment.[1] (McKeige Aff. Ex. D at 22).

 "An investor does not have to have notice of the entire fraud being perpetrated to be on inquiry notice." *Dodds,* 12 F.3d at 352; see also *Lenz,* 833 F.Supp. at 370 ("facts in the sense of indisputable proof or any proof at all, are different from facts calculated to excite inquiry which impose a duty of reasonable diligence and which, if pursued, would disclose the fraud."). "It is sufficient that plaintiffs had knowledge of . . . aspects of the fraud . . ." *Kosovich v. Thomas James Associates,* 1995 WL 135582, * 3 (S.D.N.Y. 1995); cf. *Quantum Overseas, N.V. v. Touche Ross & Co.,* 663 F.Supp. 658, 664 (S.D.N.Y.1987) ("because [plaintiff] knew in April, 1985 that the Prospectus contained 'misstatements,' it was required to bring suit within one year of that time, even if it did not know the extent of those misstatements."). For purposes of determining whether plaintiffs were under a duty to investigate, then, the question is not whether the materials suggested the full extent of defendant's deceit; the question is whether the materials suggested that there were any material misrepresentations. To the extent that there was such a suggestion, plaintiffs were left with a duty to inquire into the reliability of defendant's investment advice. If they failed in this respect, they must be held to leave

had constructive knowledge not merely of those facts directly implicated on the face of the materials available to them, but also of any information that would have come to light during the course of a reasonable investigation. *See Lenz,* 833 F.Supp. at 370–71.

There is no question that the prospectuses directly revealed certain of defendant's misrepresentations by detailing the dates of maturity on the bonds, the risk that a secondary market for resale might not be available, and the potential for price fluctuation in connection with changing interest rates. It is also clear that these were "key facts" for plaintiffs at the time of their initial investment, and for purposes of their suit. *See Butala,* 916 F.Supp. at 318. Indeed, plaintiffs attribute their losses to these factors, and emphasize these alleged misstatements throughout their complaint. *See, e.g.,* Complaint at ¶¶'s 28, 29, 42, 43, 47, 52. Because plaintiffs had sufficient information to recognize the probability that defendant was misleading them as to such material information, it became plaintiffs' responsibility to investigate the quality and reliability of defendant's overall investment advice. *See Butala,* 916 F.Supp. at 318 ("A reasonable investor would have had ample reason to investigate the status of an investment for which so much of what had been promised had not come true.").

Once plaintiffs were aware that their bonds were prone to price fluctuation in connection with changing interest rates and that the maturity of those bonds could be delayed by years (even decades), there was nothing preventing them from learning of the more calamitous possibilities of which they now complain. Through the prospectuses and other account materials they received, plaintiffs were kept apprised of the investments being made on their behalf, and they were aware that certain of those investments were being made on margin. Plaintiffs therefore

---

**1.** This risk did not ultimately come to pass, and was not the reason that plaintiffs sustained a loss-on:their account. In fact, plaintiffs lost money on their investment because they sold before maturity—a matter which directly implicates defendant's misrepresentations concerning the anticipated four to five year return. In other words, plaintiffs were on notice of the fraud that

actually accounts for their losses, and are therefore left to press an argument based upon a separate alleged omission (*i.e.,* defendant's failure to reveal the risk of a margin call). As defense counsel put it during oral argument, this appears to be an instance of the "tail wagging the dog."

had sufficient information, had they pursued the matter, to learn that their portfolio included bonds which were sensitive to increasing interest rates, and that a margin call was a conceivable risk associated with their account. This is confirmed by reasoning backward from what plaintiffs learned when they finally enlisted the help of a friend. When Mrs. Addeo informally consulted an associate from her office, an individual who was only newly familiar with the especially high risk bonds purchased on plaintiffs' account, plaintiffs quickly learned that they faced the risk of a complete loss of their initial investment. In short, the prospectuses and other account materials available to plaintiffs provided them with at least "constructive notice" of the various risks associated with the investments being made on their behalf.

This conclusion—that a reasonable investigation would have alerted plaintiffs to the risks of which they now complain—of course telecasts the Court's view as to whether plaintiffs did in fact conduct a reasonable, and timely, investigation. As explained below, as a matter of law, they did not.

2. Plaintiffs' Duty To Investigate

■ "[T]he question of whether a plaintiff exercised reasonable diligence is usually a question of fact for the jury to decide." *Lenz*, 833 F.Supp. at 371. As explained by the Court in *Lenz*, however, this is not always the case:

> If it can be determined from the face of the documents and the facts in evidence on a summary judgment motion that plaintiff was placed on notice of the probability of fraud, and he failed to exercise reasonable diligence in discharging that duty to inquire, the court is compelled to impute constructive knowledge of the fraud to plaintiff and grant defendants' motion for summary judgment as a matter of law.

*Id.* Such a finding is appropriate in light of the record before the Court.

■ Prior to June 1994, which was one year before they commenced this action, the only steps that plaintiffs took to insure the security of their investment involved their decision to meet with defendant in order to question him regarding the changing "names" in their account, and in order to urge him to invest their funds prudently.[2] During this meeting, in the summer of 1993, defendant allegedly reiterated virtually every misleading statement, and persisted in every significant omission, identified by plaintiffs in their complaint. Most notably, defendant continued to insist that plaintiffs could expect theft their bonds would mature in four to five years—a representation flatly contradicted by account materials already in plaintiffs' possession. Nevertheless, plaintiffs did not pursue their "investigation" beyond this meeting, at least not until after the statute of limitations started to run. It seems, then, that defendant succeeded in reassuring plaintiffs simply by continuing to make the very misrepresentations as to which plaintiffs already were on inquiry notice.

■ Plaintiffs argue that it was reasonable for them to rely upon defendant's continued misrepresentations, because, as their broker, he was their fiduciary. Plaintiffs are correct that an investor can ordinarily rely upon the representations of their fiduciary. *See Zola v. Gordon*, 685 F.Supp. 354, 364 (S.D.N.Y.1988) ("when the parties are engaged in a fiduciary relationship, the complaining party can claim the benefit of the fraudulent concealment doctrine even absent an affirmative misrepresentation by the party under the fiduciary duty."). This is true, however, only to a point. Plaintiffs were entitled to rely upon their "confidential relationship" with defendant only until events transpired "which would normally awaken suspicion in the[m]." *Id.* at 365 (citations omitted). As already demonstrated, by the time of their meeting with defendant, plaintiffs had already been placed on "inquiry notice" that there were direct contradictions between certain of defendant's advice and certain significant facts set forth in their account materials. Once plaintiffs were

---

**2.** The fact that plaintiffs called such a meeting, in the summer of 1993, belies their claim that they were not, in fact, on notice of defendant's fraud prior to June 1994. Their decision to question defendant, and subsequently to discontinue any additional margin investments, suggests that plaintiffs had indeed grown suspicious of defendant prior to that time.

thereby left with reason to be suspicious of defendant, it was no longer reasonable for them to defer to his representations. *Id.; see also Butala,* 916 F.Supp. at 320 ("Whatever duties the defendants owed to the plaintiffs, their alleged failure to disclose facts would not excuse the plaintiffs' lack of diligence in investigating the facts of which they were unquestionably aware.") (citations omitted).

### B. Defendant's Commission

■ Plaintiffs argue that, whatever the prospectuses might have alerted them to, they never obtained any notice that defendant recovered a commission of .25% on the interest paid in connection with those investments that he recommended be made on margin. Plaintiffs treat defendant's omission in this regard as an independent fraud, one unaffected by defendant's statute of limitations argument. In avoiding the limitations pitfall, however, plaintiffs expose themselves to another: if treated as an independent fraud, there is insufficient evidence that defendant's alleged concealment of his commission from Bear Stems caused plaintiffs any damages.

■ Though defendant ultimately prevails with respect to the commission issue, his most prominent argument on this point must be rejected. In his Opposition, defendant contends that his $ 7,000 commission cannot support a claim of fraud because, in comparison to the total dollars involved in plaintiffs' account, it was not material. This position, however, misapplies materiality as that term is used in the securities fraud context. Information is material, for purposes of Rule 10b–5, if there is a substantial likelihood that a reasonable investor would have considered it important in making an investment decision. *See TSC Industries v. Northway, Inc.,* 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976). The issue here, then, is not whether § 7,000 is a lot of money as compared to the investments being made on plaintiffs behalf; the issue is whether it might have mattered to a reasonable investor that defendant was recommending investments in which he had a personal stake. *Id.* Though defendant's commission was small,

the Court cannot say, as a matter of law, that the potential conflict of interest arising out of that commission would not have been material in the eyes of a reasonable investor. *See Chasins v. Smith Barney & Co.,* 438 F.2d 1167, 1172 (2d Cir.1970) ("Knowledge of the additional fact of market making by Smith, Barney in the three securities recommended could well influence the decision of a client in Chasin's position ... disclosure of the fact would indicate the possibility of adverse interests which might be reflected in Smith, Barney's recommendations."); *see also Gary Plastic Packaging v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 756 F.2d 230, 242 (2d Cir.1985) ("Commissions that defendants receive on the CD's they sell to the public are relevant and must be disclosed."); *Securities & Exchange Com'n v. Hasho,* 784 F.Supp. 1059, 1110 (S.D.N.Y.1992) ("The failure to disclose such commissions deprives the customer of the knowledge that his registered representative might be recommending a security based upon the registered representative's own financial interest rather than the investment value of the recommended security."). Therefore, the Court does not find that the concealment of this arrangement was immaterial.

Plaintiffs must prove more than materiality, however. They must prove that they relied upon defendant's omission concerning his conflict of interest and that they sustained damages as a result. *See Burke,* 981 F.2d at 1378; *see also Citibank, N.A. v. K–H Corp.,* 968 F.2d 1489, 1494 (2d Cir.1992). In *Burke,* the Second Circuit focused upon these issues of reliance and damages in the securities fraud context. The plaintiff shareholder in that case, an employee of a corporation acquired in a merger, complained that she was misled by the president of her company in connection with the merger, in part, by his failure to disclose his personal interest in the transaction. The Court granted plaintiff a presumption in her favor on the question of reliance, or transaction-causation, because the allegedly withheld information was material. Summary judgment was appropriate, however, because plaintiff offered "no evidence that the claimed misrepresentations or omissions caused her any injury." *Id.* at 1379. To the contrary, by her own represen-

tations, plaintiff would not have done anything differently to protect her investment had she been alerted to those facts that had allegedly been concealed. *Id.* at 1379–80.

As in *Burke,* plaintiffs in this action have "failed to come forth with sufficient evidence to permit a reasonable juror to return a verdict in [their] favor" on an "essential element" of their claim. *Burke,* 981 F.2d at 1378. Indeed, even granting plaintiffs a presumption in their favor on the question of reliance, plaintiffs have failed to identify any evidence indicating that defendant's alleged omission caused their injury. Despite having had the opportunity both during depositions and in an affidavit, plaintiffs were unable to say that they would have pursued any different course had they been alerted to defendant's commission. Most notably, in an affidavit submitted to the Court, Mrs. Addeo concedes: "I do not know for sure what we would have done at the beginning of 1993 if David Braver had told us about this when he was encouraging us to buy bonds on margin." (L. Addeo Aff. ¶ 13). This candor reveals an absence of evidence on the question of damages, an "essential element" under Rule 10b–5. It is commendable. but it is fatal to plaintiffs' claim. *Burke,* 981 F.2d at 1379.

At oral argument, plaintiffs' counsel suggested that, had they known of the margin commission, plaintiffs would have grown skeptical of defendant, and this skepticism would have prompted plaintiffs to investigate the adequacy of defendant's advice and the credibility of his recommendations. Such an investigation would have uncovered the falsehoods already discussed and thereby would have prompted plaintiffs to discontinue their relationship with defendant. This argument is clever, but it is speculative—particularly when considered in the context of plaintiffs' actual representations—to sustain a jury verdict in plaintiffs' favor.[3] Mrs. Addeo, in her affidavit, does not go so far as to say that she would have investigated defendant's advice had she known about his commission, she

says only that she would have "considered" this factor in her dealings with him. (L. Addeo Aff. ¶ 13). At other junctures, when the Addeos doubted defendant, they deferred to his own representations and assurances. There simply is no evidentiary basis for supposing that plaintiffs would not have done the same had they been aware of defendant's small commission.

The Court is not unsympathetic to plaintiffs. Indeed, the Court is unpersuaded by defendant's characterization that plaintiffs were shrewd investors who desired a high-risk portfolio and who now come to the Court seeking to hold defendant responsible for the vagaries of the market. The Complaint actually suggests a scenario in which plaintiffs were taken advantage of by a broker who cowed them into trusting his judgment, which was often times suspect and wholly inappropriate for plaintiffs' conservative investment aims. To the extent that this was in fact the nature of the relationship between the parties, it is of course unfortunate that plaintiffs are now unable to pursue their federal claims. It is unfortunate, but it is what the law requires. Moreover, the law is sensible even as applied in these circumstances; investors cannot permit themselves to be so easily influenced when their personal finances are at stake. Plaintiffs had every reason to be skeptical of defendant prior to the time that the limitations period commenced. As this holding affirms, plaintiffs placed themselves at unnecessary risk by simply taking defendant at his word and "shut[ting] [their] eyes" to the clear "storm warnings" that had been presented to them. *Armstrong,* 699 F.2d at 88.

### III. Plaintiffs' State Law Claims

■ Having found that plaintiffs have failed to make a showing " 'sufficient to establish the existence of an element essential to [their] case, and on which [they] will bear the burden of proof at trial,' " the Court must

---

**3.** The argument is also somewhat self-defeating. In essence, plaintiffs are implying that, had they investigated their portfolio more carefully than they did, they would have realized the various risks of which they now complain and responded accordingly. This essentially confirms that the investigation plaintiffs actually undertook was not adequate, and that a reasonable investigation would have revealed the full extent of the risks associated with their account. *See* Section IIA, *supra.*

consider whether it will retain jurisdiction over plaintiffs state law fraud claims. *See Brown v. E.F. Hutton Group, Inc.*, 991 F.2d 1020, 1033 (2d Cir.1993) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986)). In the interests of avoiding this Court's "needless decision of state law," I will grant defendant's request that plaintiffs' remaining state law claims be dismissed. *See Mayer v. Oil Field Systems Corp.*, 803 F.2d 749, 757 (2d Cir.1986); *see also Carnegie–Mellon University v. Cohill*, 484 U.S. 343, 350 n. 7, 108 S.Ct. 614, 619 n. 7, 98 L.Ed.2d 720 (1988) ("in the usual case in which all federal-law claims are eliminated before trial, the balance of factors ... will point toward declining to exercise jurisdiction over the remaining state-law claims."), *Eccles v. Gargiulo*, 497 F.Supp. 419, 422 (E.D.N.Y.1980) ("The court cannot but feel sympathy for plaintiffs in this case. However, their complaint raises questions of purely state law to be determined by the State courts.").

## CONCLUSION

With respect to the federal claims at issue, for the foregoing reasons, defendants' Motion for Summary Judgment is GRANTED. Because the Court has declined to exercise supplemental jurisdiction, the state law claims are dismissed with leave to file the claims in state court. The Clerk of the Court is directed to enter judgment dismissing this action in accordance with this Opinion and Order.

**SO ORDERED.**