Karol PILARCZYK, Ph.D., Roma Z. Pilarczyk, Andrzej P. Pilarczyk, Ian C. Pilarczyk, Jean–Paul Poulin and Anne M. Lagan, Plaintiffs,

v.

MORRISON KNUDSEN CORPORATION, MK Rail Corporation, William J. Agee, Stephen G. Hanks, James F. Cleary, Jr., Thomas J. Smith, John P. Herbots, James P. O'Donnell, Defendants.

No. 95–CV–1835.

United States District Court, N.D. New York.

May 19, 1997.

DeGraff, Foy, Holt–Harris, Mealy & Kunz, L.L.P., Albany, NY, for Plaintiffs; Terence J. Devine, George J. Szary, of counsel.

Nixon, Hargrave, Devans & Doyle, L.L.P., Albany, NY, for Defendants; Andrew C. Rose, of counsel.

**MEMORANDUM, DECISION & ORDER**

McAVOY, Chief Judge.

Plaintiffs bring this securities fraud action pursuant to Section 10(b) of the Securities and Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). Plaintiffs also bring various common law causes of action. Defendants now move, pursuant to Fed.R.Civ.P. 12 and 9, to dismiss the Complaint. Plaintiffs cross-move for leave to amend.

## I. BACKGROUND

### A. Facts

The following are the facts as alleged in the First Amended Complaint ("Complaint" or "Compl."). Since this motion is brought pursuant to Fed.R.Civ.P. 12(b)(6), the Court accepts these allegations as true for the purposes of this motion. *Mills v. Polar Molecular Corporation,* 12 F.3d 1170, 1174 (2d Cir. 1993).

### 1. The Parties

Plaintiffs Karol Pilarczyk ("Karol"), Roma Z. Pilarczyk ("Roma"), Andrzej P. Pilarczyk ("Andrzej"), Ian C. Pilarczyk ("Ian"), Jean Paul Poulin ("Poulin") and Anne M. Lagan ("Lagan") are residents of the Albany region in New York State. At all relevant times prior to December of 1992, Karol and Poulin were principals in TMS, Inc. ("TMS"), a New York corporation engaged from its inception in 1987 in the business of rebuilding turbochargers. Karol was the founder and president of TMS and as of December 30, 1992, owned approximately 36.9% of the issued and outstanding shares of TMS in his sole name. Poulin, the executive vice-president of TMS, owned 6.1% of the outstanding and issued shares jointly with his wife Lagan as of December 30, 1992. The remaining plaintiffs

owned the following percentages of TMS' outstanding and issued stock as of December 30, 1992: Roma, jointly with her husband Karol, 5.7%, and 3.8% in her own name; Ian, 3.5%; Andrzej, 3.5%.

Defendant Morrison Knudsen Corporation ("MK") is a major international engineering and construction company headquartered in Boise, Idaho. MK is a publicly traded Delaware corporation traded on the New York Stock Exchange. Defendant MK Rail Corporation ("MK Rail") is a Delaware Corporation incorporated by MK in 1994, into which MK "spun off" certain assets. MK Rail is headquartered in Boise, Idaho, and is in the business of manufacturing, designing and distributing locomotives and locomotive parts, as well as providing fleet maintenance services to the rail industry. Following a public offering in 1994, MK continued to hold approximately 65% of the issued and outstanding shares of MK Rail.

Defendant William J. Agee was at all relevant times the Chairman of the Board, President and CEO of MK. Defendant Stephen G. Hanks was at all relevant times the Executive Vice–President for Finance and Administration and the Secretary of MK's Board of Directors. Defendant James F. Cleary was at all relevant times the Vice President of Corporate Finance and Planning of MK. Defendant Thomas J. Smith was at all relevant times the President and Chief Executive Officer of MK's Rail Systems Group. Defendant John P. Herbots was at all relevant times the Senior Vice President and General Manager of MK's Rail Systems Group, Locomotive Division. Defendant James P. O'Donnell was at all relevant times the Director–Strategic Planning of MK.

## 2. The Allegations

During the second half of 1992, representatives of MK approached Karol and Poulin regarding the potential acquisition of TMS by MK. Extended negotiations ensued, during which plaintiffs were never told of any problems being encountered by MK in its rail business. In fact, plaintiffs were given only glowing reports regarding the condition of MK and its future prospects. For example, in his letter to shareholders in the 1991 Annual Report, Agee noted that MK was "extraordinarily well-placed to lead America through a rail renaissance," and emphasized a number of MK's successes, including: (1) winning a $380 million Illinois contract to manufacture 313 cars, the largest transit award in MK history; and (2) a $155 million contract to build 88 cars for the California Department of Transportation (the "Caltrans" contract). The 1991 report went on to state that

> MK is well-positioned to meet the growing needs of the vast transportation market. The company is unsurpassed in its ability to design, construct, manage construction, operate and finance complex infrastructure projects. MK also has gained a reputation for quality and excellence in both the manufacture of new rail cars and the remanufacture of rail cars and locomotives. MK is the only U.S.-owned and operated manufacturer of new transit cars necessary to meet the country's growing urban transit needs.

(Compl.¶ 61).

At the conclusion of the negotiations, Karol and Poulin agreed, subject to the TMS shareholders' approval, that MK could acquire TMS for a purchase price of $14,000,000. At the time of the initial agreement as to price, the structure of the transaction was not discussed; MK later informed Karol and Poulin, however, that the transaction had to be structured as a tax-free reorganization, in which the shareholders of TMS would exchange their shares for MK stock, so that MK could account for the acquisition by the pooling of interests.

Karol and Poulin also were told that as a condition of the transaction, MK required each to execute Employment Agreements and Non–Competition agreements, under which each would be paid a total of $2,000,000, in equal payments over a ten-year period. As the documents were being prepared for the acquisition, MK informed Karol and Poulin that compensation for the Non–Competition agreements would also entail stock, rather than cash: $1,500,000 of MK stock was to be placed in escrow for each of them, with 10% of the stock to be released from escrow each year for ten years. The remain-

ing $500,000 of compensation, MK informed them, would be covered by the payment of dividends on the MK stock over the life of the Non–Competition Agreements.

Between December 27, 1992 and December 30, 1992, MK and the plaintiff shareholders of TMS executed an Exchange and Purchase Agreement (the "Purchase Agreement"). Section 1.2 of the Purchase Agreement set forth the "Purchase Price" for the TMS shares as follows:

> Purchase Shares shall mean such issued shares of MK Common Stock, par value $1.66 2/3 per share ("MK Common") having an *aggregate value* of Fourteen Million Dollars ($14,000,000).

(Compl. Ex A) (emphasis added). The Purchase Agreement further provided a formula for computing the value of the MK shares, making them equal to "the unweighted average of the daily market closing price on the New York Stock Exchange composite tape for MK Common for the ten business days ending five days prior to the date of closing, as reported in the Wall Street Journal." (Compl.Ex. A, § 1.2). With a closing date of December 30, 1992, this formula resulted in a MK stock value (for the purposes of the Purchase Agreement) of $21.2125.

Section 8.4 of the Purchase Agreement provided as follows:

> 8.4 *Accuracy of Representations* No representation or warranty made by Buyer or MK contained in this Agreement or in any other writing furnished pursuant thereto, including the SEC documents, contains an untrue statement of a material fact or omits to state a material fact necessary to make the statements and facts contained herein or therein, in light of the circumstances in which they were or are made, not false or misleading.

(Compl.Ex. A, § 8.4). The "SEC Documents" are listed in Section 4.1 of the Purchase Agreement and include MK's 1991 Annual Report, Form 10–K and Proxy Statement, and MK's Quarterly Reports to Shareholders and Form 10–Q's for quarters ending March 31, 1992, June 30, 1992 and September 30, 1992.

The deal was closed on December 30, 1992, at which time TMS shareholders received a total of 659,988 shares of MK stock, with Karol and Roma collectively receiving 306,-928 shares, and Poulin and Lagan jointly receiving 40,115 shares. Andrzej and Ian each received 23,413 shares.

At the time the agreements were entered into, plaintiffs allege that MK knew of certain problems in its rail systems business. For example, plaintiffs allege that the entry of the company into transit car production was "badly flawed," and that MK had performed inadequate research into the design of transit cars. Moreover, the design and engineering of the Chicago Transit Authority cars mentioned in MK's 1991 letter to shareholders allegedly was done by a firm other than MK. Plaintiffs further assert that certain misstatements in the 1991 Annual Report were intentionally and successfully made to inflate the price of the MK stock. Finally, plaintiffs contend that the 1992 and 1993 Annual Reports contained similar misstatements of MK's financial success, prompting analysts such as First Boston, Merrill Lynch and Kidder, Peabody to issue favorable reports on MK into 1994.

Based upon MK's apparently solid financial position, MK created MK Rail in early 1994 and completed a publicly traded spin off to enable MK Rail to build, re-build and lease locomotives.

From the time TMS was acquired by MK through early 1994, Karol and Poulin continued to attend management meetings and planning sessions in connection with their employment at MK. They were never informed of any problems encountered in MK's Rail Systems Group.

On July 19, 1994, "without warning to the securities market," MK issued a press release with respect to its second quarter, announcing a net loss of $40.5 million, including a $59.4 million pre-tax loss reserve with respect to contracts in the MK transit car business. The press release addressed losses on transit car contracts which MK attributed to delays in testing and delivery of cars under the Metro North contract, as well as losses on other transit car contracts as a result of unanticipated start-up costs at MK's

new manufacturing facilities. (Compl.¶ 88). On July 20, 1994, MK further informed investors that the circumstances surrounding the California Transit Authority contract meant that "delivery of the first of 113 California cars [would] be pushed back at least two (2) months because of persistent problems with a design and its suppliers." (Compl.¶ 89).

Subsequent to these announcements, the analysts down-graded their reports on MK, and the price of MK stock plunged.

## B. Procedural History

Plaintiffs filed this action on December 22, 1995. On December 28, 1995, plaintiffs filed a First Amended Complaint containing the following causes of action: (1) violations of Section 10(b) of the Exchange Act and Rule 10b–5 promulgated pursuant thereto; (2) violation of Section 20(a) of the Exchange Act; (3) breach of contract as to the Purchase Agreement; (4) breach of the covenant of good faith and fair dealing as to the Purchase Agreement; (5) breach of contract as to the Non–Competition Agreements; (6) breach of the covenant of good faith and fair dealing as to the Non–Competition Agreements; (7) unjust enrichment; (8) common law fraud; (9) negligent misrepresentation; and (10) rescission of the Purchase Agreement.

Defendants now move to dismiss the First Amended Complaint for failure to state a claim upon which relief may be granted, arguing: (1) that plaintiffs' claims under Sections 10 and 20 and Rule 10b–5 are time-barred; (2) that the Court lacks personal jurisdiction over the individual defendants; (3) that plaintiffs have failed to plead fraud with particularity; and (4) that the state law causes of action should be dismissed for lack of subject matter jurisdiction or, in the alternative, that these claims fail as a matter of law. Plaintiffs have cross-moved for leave to file a Second Amended Complaint.

1. 17 C.F.R. § 10b–5 states, in relevant part:
 It shall be unlawful for any person, ... (a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of

## II. Discussion

### A. Standard of Pleadings under Fed. R.Civ.P. 12(b)(6)

The court should not dismiss on a Rule 12(b)(6) motion unless it appears clear that the plaintiffs cannot in any way establish a set of facts to sustain their claims which would permit relief. *Hughes v. Rowe*, 449 U.S. 5, 10, 101 S.Ct. 173, 176–77, 66 L.Ed.2d 163 (1980); *Bass v. Jackson*, 790 F.2d 260, 262 (2d Cir.1986). Furthermore, in determining the legal sufficiency of a claim, the facts as alleged must be judged in the light most favorable to the plaintiffs. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974).

It is in light of these considerations that plaintiffs' Complaint is examined.

### B. Statute of Limitations Under Section 10 and Rule 10b–5

#### 1. Inquiry Notice

Section 10(b) of the Exchange Act prohibits the use of unlawful or deceptive devices in connection with the purchase or sale of any security registered on a national securities exchange. 15 U.S.C. § 78j(b).[1] Section 20 of the Exchange Act creates derivative liability for violations of other sections of the Act. See 15 U.S.C. § 78t; *Dodds v. Cigna Securities, Inc.*, 12 F.3d 346, 350 n. 2 (2d Cir.1993).

"Litigation instituted pursuant to § 10(b) and Rule 10b–5 ... must be commenced within one year after the discovery of the facts constituting the violation and within three years after such violation." *Lampf, Pleva, Lipkind. et al. v. Gilbertson*, 501 U.S. 350, 364, 111 S.Ct. 2773, 2782, 115 L.Ed.2d 321 (1991); *see Ceres Partners v. GEL Associates*, 918 F.2d 349, 361 (2d Cir. 1990).[2] Moreover, "discovery of the facts" in

business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

2. Since liability under Section 20 of the Exchange Act is derivative of other sections of the Act, the statute of limitations for those other sections governs Section 20. *Dodds*, 12 F.3d at

this context connotes the point at which "a reasonable investor of ordinary intelligence would have discovered the existence of the fraud." *Dodds*, 12 F.3d at 350 (citing *Armstrong v. McAlpin*, 699 F.2d 79, 88 (2d Cir. 1983)) (other citations omitted). This "inquiry notice" in essence renders knowledge and the *means of* knowledge equivalent, *Armstrong*, 699 F.2d at 88, such that absent any such inquiry, knowledge will be imputed to the investor. *Dodds*, 12 F.3d at 350.[3]

### 2. Were Plaintiffs On Inquiry Notice of the Fraud?

"The test as to when fraud should with reasonable diligence have been discovered is an objective one." *Armstrong*, 699 F.2d at 88. "[I]nquiry notice is triggered by 'financial, legal or other data available to plaintiff providing ... sufficient storm warnings to alert a reasonable person to the [probability] that there were either misleading statements or significant omissions involved in the sale of the [securities].'" *Addeo v. Braver*, 956 F.Supp. 443, 1997 WL 86038 at *5 (S.D.N.Y.1997) (quoting *Lenz v. Associated Inns & Restaurants Company of America*, 833 F.Supp. 362, 370 (S.D.N.Y. 1993)).[4]

In support of their motion, defendants first rely on the July 1994 press releases. The July 19, 1994 release stated, in pertinent part, that

the losses attributable to transit car contracts are largely due to delays in testing and delivery of new transit cars under the Company's contract with Metro North which resulted in higher labor and overhead costs and contract penalties. In addition, the Company has recorded anticipated losses on three other transit car contracts which are in the early phase of production. These losses are the result of higher than planned start-up costs at the company's two new manufacturing facilities, as well as higher labor and overhead costs attributable to the scheduled delays.

(Compl.¶ 88). On July 20, 1994, MK informed its investors that "the circumstances surrounding the Caltrans contract meant that 'delivery of the first of 113 California cars [would] be pushed back at least two months because of persistent problems with a design and its suppliers.'" (Compl.¶ 89).

As defendants point out, these announcements followed prior, statements on MK's part in 1993 and 1994 which either minimized the extent of problems in the transit contracts or failed to disclose any such problems entirely. *See* Compl. ¶ 71 (Third Quarter 1993 MK 10-Q form noting increase in operating income of rail systems division); Compl. ¶ 72 (1993 press release noting continued improvement in Rail Systems Division earnings); Compl. 75 (MK announcing 1993

---

350 (citing *Herm v. Stafford*, 663 F.2d 669, 679 (6th Cir.1981)).

3. Plaintiffs' argument that inquiry notice is insufficient to commence running the one-year prong of the statute of limitations under Section 10 is unavailing. First, the Supreme Court in *Lampf* did not, as plaintiffs suggest, "expressly reject" the limitations language found in Section 13 of the Exchange Act. That language, which provides for inquiry notice, was referenced in a footnote in *Lampf, see Lampf* at 360 n. 7, 111 S.Ct. at 2780 n. 7, but was never meaningfully addressed therein (much less "explicitly rejected").

Moreover, plaintiffs' attempt to somehow discredit *Dodds'* holding on inquiry notice is somewhat peculiar. In arguing that *Dodds'* analysis of the issue of inquiry notice was inadequate, plaintiffs would have this Court ignore *Dodds* and instead follow *Werner v. Satterlee*, 797 F.Supp. 1196 (S.D.N.Y.1992), a district court decision that adopted an actual notice standard prior to the Second Circuit's decision in *Dodds*. As this Court is not afforded the luxury of choos-

ing at its leisure which of the Second Circuit's decisions it will follow and which not, plaintiffs' invitation is declined. As the *Dodds* court itself noted in the face of similar arguments, "only an in banc court or an intervening Supreme Court decision can overrule" Second Circuit precedent requiring inquiry notice. *Dodds*, 12 F.3d at 353.

4. The question of inquiry notice may be addressed on a motion to dismiss.

Where ... the facts needed for determination of when a reasonable investor of ordinary intelligence would have been aware of the existence of fraud can be gleaned from the complaint and papers such as the prospectuses and disclosure forms that are integral to the complaint, resolution of the issue on a motion to dismiss is appropriate.

*Dodds*, 12 F.3d at 352 n. 3; see *Salinger v. Projectavision, Inc.*, 934 F.Supp. 1402, 1408 (S.D.N.Y.1996); *In re Integrated Resources Real Estate Ltd. Partnerships Sec. Litig.*, 850 F.Supp. 1105, 1132–33 (S.D.N.Y.1993).

earnings of $35.8 million).; Compl. ¶ 78 (MK announcing completion of first transit car under Chicago Transit Authority contract 10 months ahead of schedule). Most notably, plaintiffs themselves assert that once the problems in the Rail Systems Group became public, plaintiffs had a "true picture of the operations of this group." (Compl.¶ 83).

Moreover, the significance of the July 1994 announcements is underscored by plaintiffs' express contention in their Complaint that they relied upon defendants' statements concerning the success of the rail systems segment of MK in entering into the Purchase Agreement. (Compl.¶ 60–62). Indeed, plaintiffs' first cause of action under Section 10(b) is premised upon misleading "statements made to Plaintiffs ... particularly related to contracts in its Rail Systems Group ...". (Compl.¶ 94); see, e.g., Integrated Resources, 850 F.Supp. at 1122 (plaintiffs were on inquiry notice where they received letter reporting low occupancy rates, "the very facts they claim to be the fraud"). It is the very theory of the plaintiffs' claims of deception, the fraudulently optimistic facade cast by defendants' "glowing reports and projections concerning MK and the future," (Pl. Mem. of Law at 13), and "rosy reports," (id.) that renders the July 1994 announcements all the more ominous, and all the more telling from the plaintiffs' perspective (and from the perspective of a reasonable investor).[5] Plaintiffs' emphasis on and reference to these announcements in their Complaint (the July 1994 announcements are included at the very end of the fact section) bespeaks much about the significance of the announcements, not to mention their prescience: "[a]s a result of the announcements regarding the losses, analysts continued to down grade their reports

on MK, with the result that the price of MK stock plunged. Since that time, MK has continued to announce disappointing news regarding the Rail Systems Group ...". (Compl.¶ 90). The July 1994 announcements were, so to speak, the beginning of the end.

"Where the company's public disclosure reveals that a particular representation about a crucial feature of an investment has not materialized, the statute of limitations is triggered." Salinger, 934 F.Supp. at 1411. There can be little doubt that the success of the Rail Systems Group was a crucial aspect of plaintiffs' decision to enter the Purchase Agreement. Plaintiffs admit as much in their Complaint. (See Compl. ¶¶ 60–62). Moreover, the July 1994 announcements, coming after months of MK's assurances of financial bliss in its Rail Systems Group, would have put a reasonable investor on notice of the probability of fraud. Certainly these plaintiffs, having acquired $16 million worth of MK stock, had a duty to inquire as to the likelihood that they had been misled.

Any doubt that plaintiffs were on inquiry notice more than one year prior to filing suit is dispelled by MK's Third Quarter 1994 10–Q, dated November 14, 1994, which revealed that between July 28, 1994 and October 20, 1994, five class-action lawsuits were filed against MK and several of its officers and directors, three in the District of Ohio and two in the District of Idaho. (Def. Mem. of Law, Ex. A).[6] All of the lawsuits were brought under the federal securities laws by MK stockholders and alleged misleading or improper disclosures. (Id.). Specifically, the Idaho lawsuits were based on allegations that "[MK] made misleading disclosures regard-

---

**5.** Plaintiffs' characterization of the problems chronicled in the July 1994 announcements as "business downturns and problems" (Pl. Mem. of Law at 13) ignores the fact that the second quarter 1994 $40.5 million net loss followed 1993 earnings of $35.8 million. "The size of losses is one factor in determining whether the shareholders received any warning signals." Phillips v. Kidder, Peabody & Co., 933 F.Supp. 303, 313 (S.D.N.Y.1996), aff'd, 108 F.3d 1370 (2d Cir.1997). In Phillips, the district court held that an 18 cent per share loss in a single quarter was "not of such magnitude as to trigger immediate suspicion." Id. at 314. MK's 1994 second quarter $40.5 million loss amounted to a loss of

$1.24 per share. (Compl.43). On July 18, 1994, one day before the loss was announced, MK stock was trading at 20 3/4; by July 26, the price had fallen to 15, a drop of over 25%. (Information provided by WESTLAW Historical Stock Quote Service).

**6.** "[I]n securities actions, the Second Circuit permits district courts to take judicial notice of federally mandated disclosure documents on motions to dismiss, even if such documents are not included in the complaint." In re Integrated, 850 F.Supp. at 1125.

*ing its transit business." (Id.)* (emphasis added).

▮ While the filing of a class action lawsuit by stockholders does not trigger inquiry notice as to all stockholders as a matter of law, *see In re Ames Department Stores, Inc. Note Litigation,* 991 F.2d 968, 981 (2d Cir. 1993), where the "prior lawsuits 'specifically concerned the very misrepresentations alleged in the (present) complaint[ ],' then the prior lawsuits constitute inquiry notice." *Sloane Overseas Fund Ltd. v. Sapiens International Corp.,* 941 F.Supp. 1369, 1375 (S.D.N.Y.1996) (quoting *Menowitz v. Brown,* 991 F.2d 36, 42 (2d Cir.1993)). It cannot be doubted here that notice of these lawsuits, combined with the staggering second-quarter loss revealed in July of 1994 (attributed largely to problems in the Rail Systems Group), were sufficient to put plaintiffs on inquiry notice, by November 14, 1994, of the probability of fraud on the defendants' part in connection with the Purchase Agreement.

▮ The analysis, however, does not end with determining the point at which the reasonable investor was put on inquiry notice. Once it is determined that a duty of inquiry arose, "the Court must then determine whether plaintiffs exercised 'reasonable diligence' in investigating the potential for a claim. If they did not, they will be held to have possessed 'constructive knowledge' of the fraud against them." *Addeo,* 956 F.Supp. 443, 449; *see Lenz,* 833 F.Supp. at 370. Nowhere in plaintiffs' Complaint is there any allegation that they exercised such diligence;[7] in fact, they assert, in response to defendants' reliance on the Third Quarter 1994 10–Q, that they did not even read the 10–Q. (Def. Mem. of Law at 13).

Therefore, since plaintiffs' Complaint and the 1994 10–Q reveal that plaintiffs were on inquiry notice no later than November 14, 1994, and since plaintiffs fail to allege reasonable diligence on their part, the Section 10(b), Rule 10b–5 and Section 20(a) claims, first filed on December 22, 1995, are untimely. Counts One and Two of the First Amended Complaint are thus dismissed.

**C. Failure to State a Claim Under Fed. R.Civ.P. 12(b)(6) and 9(b)**

Even if the claims were timely filed, however, plaintiff's federal securities claims would fail under Rules 12(b)(6) and 9(b).

**1. Statements Made After the Stock Swap/Analysts Reports**

The bulk of plaintiffs' First Amended Complaint is comprised of alleged misrepresentations and omissions made by defendants after the Purchase Agreement was entered into on December 30, 1992, *see e.g.,* Compl. ¶¶ 68–70 (statements in 1992 Annual Report, issued after the acquisition of TMS); Compl. ¶¶ 71–72 (Third Quarter 1993 10–Q and press release); Compl. ¶ 80 (form 10–k for period ending December 1993); Compl. ¶¶ 81–84 (1993 Annual Report), as well as statements of independent analysts regarding MK's financial viability. *See. e.g.,* Compl. ¶ 74 (October 1993 report of Kidder, Peabody); Compl. ¶ 77 (February 1994 report of Dean Witter); Compl. ¶ 87 (May 1994 report of Kidder, Peabody).

▮ "A statement cannot be fraudulent if it did not affect an investment decision of the plaintiff." *Mills,* 12 F.3d at 1175. In *Mills,* the Second Circuit held that an allegedly fraudulent statement made after a contract for the purchase of securities was entered into was not actionable. *Id.* The application of this principle to the present Complaint is self-evident: MK's allegedly fraudulent statements made after the signing of the

---

7. In connection with their argument that the statute of limitations was equitably tolled, plaintiffs assert that "on several occasions in 1994, plaintiffs inquired into the financial condition of the Rail Systems Group and were assured of the stability and future viability of the Group." (Def. Mem. of Law at 16). Plaintiffs refer the Court in this regard to the affidavit of Jean–Paul Poulin, submitted on this motion. Short of converting this motion to one for summary judgment pursuant to Fed.R.Civ.P. 12(b), which the Court declines to do, this affidavit cannot be considered. Thus, plaintiffs conclusory arguments as to reasonable diligence, both in the context of inquiry notice and fraudulent concealment, must fail. *See, e.g., Falik v. Parker Duryee Rosoff & Haft,* 869 F.Supp. 228, 233 (S.D.N.Y.1994) ("Equitable tolling stays the statute of limitations under Rule 10b–5 only as long as the defrauded party satisfies his duty to exercise reasonable diligence to discover the fraud.").

December 30, 1992 Purchase Agreement could not have served as a retroactive inducement for that agreement. Thus, no such statements are actionable under Section 10(b) or Rule 10b–5.

 Similarly, none of the statements attributed to the analysts are actionable. In addition to having been made after the Purchase Agreement was entered into, the analysts' reports fail to state a claim for fraud under federal securities laws since any statements therein are not properly attributable to defendants. While plaintiffs allege that the reports were "based on MK's statements," (Compl.¶ 87), or were issued "as a result of the MK filings with the SEC," (Compl.¶ 74), plaintiffs fail to allege what information MK supplied to the analysts, who supplied it, or how MK may have controlled the contents of the reports. See *Raab v. General Physics Corp.,* 4 F.3d 286, 288 (2d Cir.1993). Since these reports cannot be attributed to MK, the statements therein are not actionable. See *Elkind v. Liggett & Myers. Inc.,* 635 F.2d 156, 163 (2d Cir.1980). Thus, the only statements for which defendants might potentially be liable under Section 10(b) and Rule 10b–5 are those made during negotiations regarding the Purchase Agreement, to wit, the 1991 Annual Report. (See Compl. ¶¶ 60–61). The Court will now examine the sufficiency of plaintiffs allegations of fraud as to these statements under the applicable standards.

### 2. The Pleading Standard for Securities Fraud

 To make out a claim for securities fraud, the plaintiffs must allege that "in connection with the purchase or sale of securities, the defendant, acting with scienter, made a false material representation or omitted to disclose material information and that plaintiffs' reliance on defendant's action caused [plaintiffs] injury." *Acito v. IMC-ERA Group. Inc.,* 47 F.3d 47, 52 (2d Cir. 1995) (further citation omitted). Claims under Section 10(b) and Rule 10b–5 are subject to the requirements of Fed.R.Civ.P. 9(b), *see Mills,* 12 F.3d at 1175 (*citing, Cosmas v. Hassett,* 886 F.2d 8, 11 (2d Cir.1989)), which requires that "the circumstances constituting fraud ... shall be stated with particularity." [8] To comport with Rule 9(b), " 'the complaint must: (1) specify the statements that the plaintiffs contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.' " *Acito,* 47 F.3d at 51 (quoting *Mills,* 12 F.3d at 1175).

 This Circuit also requires that the plaintiffs allege facts that give rise to a strong inference of fraudulent intent. See *Mills,* 12 F.3d at 1176. The requisite "strong inference" of fraud may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness. *See In re Time Warner Inc. Securities Litigation,* 9 F.3d 259, 268–69 (2d Cir.1993).

### 3. The Standard Applied

Plaintiffs' theory is that defendants, through a series of fraudulent and misleading

---

**8.** Perhaps most significantly, Congress recently passed the Private Securities Litigation Reform Act of 1995 ("Reform Act"), Pub.L. 104–67, which amended the Exchange Act. The Reform Act provides, in pertinent part, that a complaint alleging fraud under Section 10(b)

> shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading and, if an allegation regarding the *statement or omission is* made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

15 U.S.C. § 78u–4(b)(1), 109 Stat. 737, 747 (Dec. 22, 1995).

There is some dispute as to whether these amendments apply to plaintiffs' Complaint, which was filed December 22, 1995, the effective date of the Reform Act. The amendments do not apply to private actions "commenced before and pending on" December 22, 1995. P.L. 104–67, 109 Stat. 737, 758, § 108 (emphasis added). By the plain language of the statute, the amendments apply to the present action, since plaintiffs' Complaint was not commenced *before* December 22, 1995.

In any event, this dispute is much ado about nothing, since the Reform Act merely adopts the stringent pleading requirements of the Second Circuit. *See* S.Rep. No. 98, 104th Cong., 1st Sess. 15 (1995), *reprinted in* 1996 U.S.S.C.A.N. 679, 694. There surely can be no question that plaintiffs' Complaint must comport with *those* requirements.

statements and omissions issued prior to and during the negotiations regarding the Purchase Agreement, artificially drove up the price of MK stock and gave the public (and plaintiffs in particular) a false impression of MK's profitability. (*See* Compl. ¶¶ 38–42, 59, 60–61, 64, 66, 94). Plaintiffs further contend that defendants knew, or should have known "that there were serious problems in the rail systems business which later came to light" (Compl.¶ 65), including: (1) the fact that MK was deliberately underbidding contracts for the manufacture of rail cars below its own internal estimates; (2) that MK was unable to meet its contract schedules, despite representations to the contrary; (3) that MK was experiencing undisclosed delays in testing of new transit cars; (4) that MK knew, unknown to its investors and the public, that persistent design problems with cars would push back delivery on the Caltrans contract; and (5) that manufacturing delays were causing undisclosed higher labor costs. (Compl.¶ 94).

In terms of misleading statements, while the First Amended Complaint quotes extensively from the 1991 Annual Report, (*see* Compl. ¶¶ 62–63) and alludes generally to "a series of false and misleading favorable public statements, in filings with the SEC, press releases, interviews and in communications with securities analysts" (Compl.¶ 38), nowhere is there any allegation as to what specific statements in the 1991 Report plaintiffs allege to have been fraudulent. Nor do plaintiffs explain "in what respects the statements at issue were false," or "allege facts that give rise to a strong inference of fraudulent intent." *San Leandro Emergency Med. Plan v. Philip Morris,* 75 F.3d 801, 812 (2d Cir.1996); *see Acito,* 47 F.3d at 51–52; *Shields v. Citytrust Bancorp. Inc.,* 25 F.3d 1124, 1127–28 (2d Cir.1994). At various points, plaintiffs merely allege in general and conclusory terms that these statements were false or misleading (*see, e.g.,* Compl. ¶ 38), without specifically alleging why. See 15

U.S.C. § 78u–4(b)(1), 109 Stat. 737 (1995) (complaint alleging fraud under Section 10(b) "shall specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading."); *Salinger,* 934 F.Supp. at 1413 (broad allegation of fraud as to extensively quoted press releases and reports failed to adequately identify how each statement was fraudulent or misleading). In short, plaintiffs extensive (and generic) reliance on the 1991 Annual Report as the basis for their claims must fail.

Moreover, plaintiffs' invocation of the alleged circumstances or problems relating to the rail systems business of which defendants allegedly were aware, and which (by omission) allegedly rendered the forecasts in the 1991 Annual Report misleading, fails to sufficiently illustrate how or why specific statements in the 1991 report were, in fact, false at the time they were made. Plaintiffs do not allege when MK was aware of these problems, when the problems developed, or who was aware of them. *Cf. Arazie v. Mullane,* 2 F.3d 1456, 1467 (7th Cir.1993) ("references to unreleased or internal information that allegedly contradict[s] [defendants'] public statements" should indicate "who prepared the projected figures, when they were prepared, how firm the numbers were, or which [company] officers reviewed them."). Nor do plaintiffs allege the basis upon which they make these assertions.

For all of these reasons, plaintiffs have failed to plead their fraud claims with sufficient particularity pursuant to Fed.R.Civ.P 9(b), Second Circuit pleading standards, and the Reform Act. These failures would merit dismissal of Counts One and Two of the Complaint.

### D. The State Law Claims [9]

#### 1. Fraud Under New York Law

To state a claim for fraud under New York law, plaintiff must allege: (1) a

---

**9.** Initially, defendants argue that the Court should decline to exercise supplemental jurisdiction over the state law claims, since the federal claims upon which original jurisdiction is premised have been dismissed. *See* 28 U.S.C. § 1367(c)(3) ("the district court may decline to

exercise supplemental jurisdiction over a claim ... if ... (3) the district court has dismissed all claims over which it has original jurisdiction"). However, since plaintiffs properly assert diversity jurisdiction under 28 U.S.C. § 1332 in their proposed Second Amended Complaint, the Court

material misrepresentation; (2) falsity; (3) scienter; (4) reasonable reliance; and (5) damages. *May Dep't Stores Co. v. International Leasing Corp.*, 1 F.3d 138, 141 (2d Cir.1993); *Katara v. D.E. Jones Commodities, Inc.*, 835 F.2d 966, 970–71 (2d Cir.1987). Since, however, the elements of fraud under New York law and Section 10(b) essentially are the same, *Fruchtman v. First Edition Composite Holdings. Inc.*, 1991 WL 238273 at *4 (S.D.N.Y.), and since common law fraud also must be pleaded with particularity under Fed.R.Civ.P. 9(b), *see Update Traffic Systems. Inc. v. Gould*, 857 F.Supp. 274, 285 (E.D.N.Y.1994), plaintiffs' common law fraud claims "suffer from the same deficiencies" as do their Section 10(b) claims and must therefore be dismissed. *See Pits, Ltd., v. American Express International*, 911 F.Supp. 710, 719 (S.D.N.Y.1996); *Morse v. Weingarten*, 777 F.Supp. 312, 319 (S.D.N.Y.1991).

### E. Breach of Contract/Rescission

In Counts Three and Five of the First Amended Complaint, plaintiffs allege that defendants breached the Purchase Agreement and the Non–Competition Agreements, respectively. These claims are based upon defendants' alleged misrepresentations as to the value of the MK stock that served as the consideration in these contracts.

Under New York law, the parties to a contract are free to bargain as to the consideration exchanged, even if that consideration is "grossly unequal or of dubious value." *Apfel v. Prudential–Bache Securities, Inc.*, 81 N.Y.2d 470, 600 N.Y.S.2d 433, 435, 616 N.E.2d 1095, 1097 (1993). "Far from consideration needing to be coextensive or even proportionate, the value or measurability of the thing forborne or promised is not crucial as long as it is acceptable to the promisee." *Weiner v. McGraw–Hill, Inc.*, 57 N.Y.2d 458, 457 N.Y.S.2d 193, 197, 443 N.E.2d 441, 445 (1982). Thus, in the absence of fraud or unconscionability, the adequacy of consideration is not a proper subject of judicial review. *Apfel*, 600 N.Y.S.2d at 433, 616 N.E.2d 1095; *Kinley Corp. v. Ancira*, 859 F.Supp. 652, 657 (W.D.N.Y.1994).

will address the sufficiency of the state law

Plaintiffs, relying on *In re Estate of Bennett*, 205 N.Y.S.2d 50 (Sur.Ct.1960), argue that since they allege *fraud* in connection with defendants' valuation of the stock, they have stated a claim for breach of contract. That case, however, serves only to bolster defendants' argument that fraud in the inducement affects only the *validity* of the contract itself. *Id.* at 53. Thus, while fraud is a proper consideration in terms of equitable remedies in a contract action, *see id.* at 53 ("There is no doubt, however, that inadequacy of consideration, when combined with fraud … is a most material ingredient in the case as affecting the discretion of the Court in *granting specific performance or determining validity.*") (emphasis added), the fraud alleged in plaintiffs' breach of contract claims does not amount to a breach of the *terms* of the contract.

Rescission, however, is a proper remedy for fraud in the inducement. *See Hadden v. Cons. Edison Co. of N.Y.*, 34 N.Y.2d 88, 356 N.Y.S.2d 249, 257, 312 N.E.2d 445, 450–51 (1974); *Kutas v. State*, 135 Misc.2d 1044, 517 N.Y.S.2d 857, 861 (Ct. Claims 1987), *aff'd*, 146 A.D.2d 542, 537 N.Y.S.2d 30 (1st Dep't 1989). Of course, since such claims are based upon fraud, they too must meet the particularity requirements of Fed.R.Civ.P. 9(b). *See, e.g., Gindi v. Silvershein*, 1995 WL 347397 at *5 (S.D.N.Y.) (dismissing fraudulent inducement claim under Rule 9(b)); *Ox v. Union Central Life Ins. Co.*, 1995 WL 296541 at *5 (S.D.N.Y.) (same). Since plaintiffs have failed to satisfy these requirements, their breach of contract and rescission claims must be dismissed.

### F. Breach of Covenant of Good Faith/Unjust Enrichment

"Under New York law, parties to an express contract are bound by an implied duty of good faith, but breach of that duty is merely a breach of the underlying contract." *Fasolino Foods Co. v. Banca Nazionale del Lavoro*, 961 F.2d 1052, 1056 (2d Cir.1992); *see also Union Carbide Corp. v. Montell N.V.*, 944 F.Supp. 1119, 1136 (S.D.N.Y.1996); *National Football League v. Dallas Cowboys*,

claims under Fed.R.Civ.P. 12(b)(6).

922 F.Supp. 849, 855 (S.D.N.Y.1996). Similarly, unjust enrichment is a quasi-contractual remedy unavailable where an express contract exists. *Apfel,* 600 N.Y.S.2d at 437, 616 N.E.2d 1095; *Foxley v. Sotheby's, Inc.,* 893 F.Supp. 1224, 1234 (S.D.N.Y.1995). Since plaintiffs' breach of covenant and unjust enrichment claims are duplicative of their breach of contract claims, they too must be dismissed. *Union Carbide,* 944 F.Supp. at 1136; *National Football League,* 922 F.Supp. at 855; *Foxley* 893 F.Supp. at 1234.

## G. Negligent Misrepresentation

 Lastly, defendants argue that plaintiffs claims for negligent misrepresentation must be dismissed. "[U]nder New York law, a plaintiff may recover for negligent misrepresentation only where the defendant owes her a fiduciary duty." *Stewart v. Jackson & Nash,* 976 F.2d 86, 90 (2d Cir.1992). The question of whether defendants owed plaintiffs a fiduciary duty in this case need not be addressed, however, since the negligent misrepresentation claims must be dismissed along with the fraud claims. The particularity requirements of Rule 9(b) apply to claims of negligent misrepresentation as well. *Simon v. Castello,* 1997 WL 148243 at *2 (S.D.N.Y.); *In re Leslie Fay Companies. Inc. Securities Litigation,* 918 F.Supp. 749, 766 (S.D.N.Y.1996); *Garcia v. Spanish Broadcasting System, Inc.,* 1993 WL 177936, at *3 (S.D.N.Y.). Because of the lack of particularity discussed above, Counts Ten and Eleven of the First Amended Complaint must be dismissed.

## H. Plaintiffs' Cross–Motion to Amend

 Plaintiffs cross-move for leave to file a Second Amended Complaint. Under Fed. R.Civ.P. 15(a), "leave [to amend] shall be freely given when justice so requires." Leave should be denied, however, when it would be futile, cause undue delay or prejudice, or when it is sought in bad faith. *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962). Plaintiffs include a number of changes in their proposed Second Amended Complaint. The Court will address these amendments *seriatim.*

### 1. Diversity Jurisdiction

Paragraph 3 of the proposed Second Amended Complaint asserts jurisdiction based upon diversity of citizenship of the parties pursuant to 28 U.S.C. § 1332. Since, however both the federal and state law claims have been dismissed, the assertion of an alternative basis of jurisdiction at this point is futile.

### 2. Dropping Defendants

The proposed Second Amended Complaint drops certain defendants from certain Counts. *See, e.g.,* Prop. Am. Compl. Count Two (dropping MK and MK Rail); Count Three (dropping individual defendants); Count Four (dropping individual defendants). Since all of these claims have been dismissed in their entirety, such amendment would be insufficient to revive these claims.

### 3. Amendments Regarding Inquiry Notice

At paragraph 92 of the proposed Second Amended Complaint, plaintiffs allege that, notwithstanding the July 19, 1994 announcement of the second quarter loss, "the true condition of MK's finances was still withheld from the public and the plaintiffs." Plaintiffs further allege that information regarding MK's financial status and the extent of defendants' deception was not available until February of 1995.

 These proposed amendments are futile as well. "The test as to when fraud should with reasonable diligence have been discovered is an *objective* one." *Armstrong,* 699 F.2d at 88 (emphasis added). Thus, plaintiffs' allegations as to what they actually and subjectively did or did not know in July of 1994 are irrelevant for the purposes of determining when they were on inquiry notice. Moreover, plaintiffs' conclusory allegations of fraudulent concealment (Prop.Am. Compl.¶ 46) are insufficient as a matter of law to toll the statute of limitations. *Armstrong,* 699 F.2d at 88.

### 4. Amendments Regarding Personal Jurisdiction

In response to defendants' argument that the Second Amended Complaint should be

dismissed for lack of personal jurisdiction over the individual defendants, plaintiffs assert in the proposed Second Amended Complaint that negotiations surrounding the Purchase Agreement took place in New York. (Prop.Am.Compl.¶ 48). Since all claims have been dismissed on other grounds, however, this amendment would be futile.

### 5. Miscellaneous Amendments

Plaintiffs also submit a number of minor proposed changes, (Prop.Am.Compl.¶¶ 40, 41, 42, 58, 67, 71, 113, 130), none of which are sufficient to cure the defects discussed in part II(C)(3), *supra.* The changes serve neither to elucidate nor particularize the fraudulent nature of any statements, who uttered them, when they were uttered or the defendants' knowledge that they were false. Thus, such amendments would be futile.

### III. Conclusion

For all of the foregoing reasons, it is hereby

ORDERED, that defendants' motion to dismiss is GRANTED in its entirety, and the First Amended Complaint is DISMISSED; it is further

ORDERED, that plaintiffs cross-motion for leave to amend is DENIED.

**IT IS SO ORDERED.**